[No. S060370. Aug. 31, 1998.]

RICHARD GREEN, Plaintiff and Appellant, v.
RALEE ENGINEERING COMPANY, Defendant and Respondent.

**COUNSEL**

Oshman, Brownfield & Smith, George E. Brownfield, Quackenbush & Quackenbush and William C. Quackenbush for Plaintiff and Appellant.

Joseph Posner and James P. Stoneman II as Amici Curiae on behalf of Plaintiff and Appellant.

Nemecek & Cole, Jonathan B. Cole, Scott C. Pape and Craig G. Staub for Defendant and Respondent.

Latham & Watkins, Wayne S. Flick and M. Michelle Alvarez as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**CHIN, J.**—May administrative regulations be a source of fundamental public policy that limits an employer's right to discharge an otherwise at-will employee? Although our Legislature has determined that an employment contract is generally terminable at either party's will (Lab. Code, § 2922),[1] we have created a narrow exception to this rule by recognizing that an employer's right to discharge an at-will employee is subject to limits that fundamental public policy imposes. (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] (*Tameny*).) In *Tameny,* we drew from *Petermann* v. *International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184 [344 P.2d 25] (*Petermann*) to hold that at-will employees may recover tort damages from their employers if they can show they were discharged in contravention of fundamental public policy. (*Tameny, supra,* 27 Cal.3d at p. 177.) Both *Tameny* and *Petermann* relied on substantial public policy concerns to limit the employer's discharge right, and subsequent cases have recognized similarly narrow public policy violations for discriminatory or retaliatory termination. (*Tameny, supra,* 27 Cal.3d at p. 172; *Petermann, supra,* 174 Cal.App.2d at p. 188 [perjury]; *Stevenson* v. *Superior Court* (1997) 16 Cal.4th 880, 894 [66 Cal.Rptr.2d 888, 941 P.2d 1157] (*Stevenson*) [age discrimination]; *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 90-91 [276 Cal.Rptr. 130, 801 P.2d 373] [sex discrimination].)

Following *Tameny, supra,* 27 Cal.3d 167, this court explained that employees who assert *Tameny* claims must show that the important public interests they seek to protect are "tethered to fundamental policies that are delineated in constitutional or statutory provisions." (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680] (*Gantt*).) Here, we address a related, albeit narrow issue. We must decide whether particular administrative regulations implementing the Federal Aviation Act of 1958 (72 Stat. 731, 49 U.S.C. former appen. § 1301 et seq., now § 40101 et seq.), a public safety statute that created the Federal Aviation Administration (FAA), should be included as a source of fundamental public policy that limits an employer's right to discharge an at-will employee. Like the Court of Appeal, we conclude they should.

We continue to believe that, aside from constitutional policy, the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state. (See *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 818, 824, fn. 10 [274 Cal.Rptr. 820, 799 P.2d 1253]; see also *Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290, 297 [188 Cal.Rptr. 159,

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

35 A.L.R.4th 1015] [Courts must not "mistake their own predilections for public policy which deserves recognition at law.".) Recognizing this important distinction, however, does not allow us to ignore the fact that statutorily authorized regulations that effectuate the Legislature's purpose to ensure commercial airline safety are "tethered to" statutory provisions.

We therefore affirm the Court of Appeal's judgment in favor of Richard Green (plaintiff) and against Ralee Engineering Company (defendant), and we remand the matter for proceedings consistent with this judgment.

## Discussion

### A. *Summary Judgment Rules*

■ Because the case arises out of a summary judgment motion that the trial court originally granted, we initially note that under the 1992 and 1993 amendments to Code of Civil Procedure section 437c, a defendant moving for summary judgment "has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the [plaintiff's] cause of action . . . cannot be established . . . ." (Code Civ. Proc., § 437c, subd. (o)(2).)[2] Once the defendant satisfies this obligation, the burden shifts to the plaintiff "to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (o)(2).)

Both the trial courts and the appellate courts apply these principles in resolving summary judgment motions. "On appeal, however, the appellate court conducts an independent review of the trial court's resolution of questions of law. [Citations.]" (*Davis* v. *Consolidated Freightways* (1994) 29 Cal.App.4th 354, 360 [34 Cal.Rptr.2d 438].) Keeping these rules in mind, we turn our attention to defendant's appeal.

### B. *Facts*

The principal facts alleged are these: Defendant manufactures fuselage and wing components for military and civilian aircraft. It supplies those parts to major airline assembly companies such as Boeing and to major war plane assembly companies such as Northrop. In 1968, defendant hired plaintiff as a quality control inspector. Plaintiff was an at-will employee, and, as such, could be discharged at any time, and for any reason not otherwise prohibited

---

[2]Subdivision (o)(2) was added to Code of Civil Procedure section 437c in 1992 as subdivision (n)(2). (Stats. 1992, ch. 1348, § 1, pp. 6702-6703.) It was amended and renumbered in 1993. (Stats. 1993, ch. 276, § 1.)

by law. (§ 2922.) By the early 1990's, plaintiff was in his 50's and working the night shift as part of a 4-member team inspecting aircraft parts before defendant shipped them to Boeing, Northrop, and other aviation companies.

Beginning in 1990, plaintiff allegedly noticed defendant was shipping some airplane parts even though, according to plaintiff, they failed the inspections his team performed. On several occasions over the next two years, plaintiff objected to defendant's practice to supervisory and management personnel and to the company president. Plaintiff made all of his complaints internally, and at no time did he complain to outside government sources.

According to plaintiff, his complaints met with varying results. Defendant corrected its practices to conform to Northrop's contractual requirements. Nonetheless, defendant continued to ship allegedly defective parts to Boeing. In an effort to provide proof of the ongoing practice, plaintiff began photocopying the inspection reports, including some reports concerning parts destined for Boeing.

In March 1991, defendant shut down its night shift, citing a downturn in orders for the parts it produced. Defendant then discharged plaintiff along with other night shift employees. At the same time, defendant retained several other night shift inspectors, some with less experience than plaintiff.

Plaintiff filed a timely wrongful termination action against defendant. He alleged defendant terminated him in retaliation for his complaints about its inspection practices. Plaintiff also claimed his complaints served a broad public policy favoring aviation safety, entitling him to tort damages even though he was an at-will employee.

Defendant sought summary judgment against plaintiff. Defendant observed it was entitled to discharge plaintiff, an at-will employee, even if it was motivated by his objections to its inspection and shipping practices, because no statute or constitutional provision specifically prohibited these practices. Defendant claimed that plaintiff could not establish his cause of action for wrongful termination as a matter of law (Code Civ. Proc., § 437c, subd. (o)(2)) because "[p]laintiff's termination was not in violation of any fundamental public policy embedded in either a statute or constitutional provision." Defendant noted that plaintiff cited to the entire Federal Aviation Act of 1958 (49 U.S.C. former appen. § 1301 et seq., now § 40101 et seq.) to

support his *Tameny* claim; he cited no specific statute or constitutional provision to support the claim.[3]

The trial court granted summary judgment in defendant's favor. It stated that plaintiff was an at-will employee whom defendant could discharge without cause. (§ 2922.)

Plaintiff appealed, and the Court of Appeal reversed the judgment. After engaging in independent research, the court identified several key federal regulations involving airline safety on which plaintiff now relies and requested supplemental briefing on whether those regulations could form the basis for plaintiff's public policy claim. The court considered defendant's contention that during the pretrial discovery phase plaintiff failed to produce the appropriate statutes to support his assertion at the summary judgment stage, but concluded that plaintiff had adequately identified several relevant FAA regulations as part of his opposition to summary judgment. Finding airline safety so closely tied to the statutory and regulatory purpose, the Court of Appeal concluded that plaintiff had established a sufficient connection between the public policy favoring safe manufacture of passenger aircraft and federal law to satisfy our rule that the public policy be based on either a statute or constitutional provision.

Defendant argues principally that, even if we assume it did everything plaintiff claimed, its conduct violated no public policy embodied in a constitutional or statutory provision. Consequently, defendant argues, plaintiff's discharge fails to qualify as a wrongful discharge justifying a *Tameny* claim.

As we explain, we agree with the Court of Appeal in concluding that the federal safety regulations promulgated to address important public safety concerns may serve as a source of fundamental public policy. The regulations satisfy our requirement that the action be tethered to fundamental policies delineated in a statutory or constitutional provision. (*Stevenson, supra,* 16 Cal.4th at p. 894.)

---

[3]In the alternative, defendant asserted it was entitled to discharge plaintiff for photocopying company inspection reports without its authorization. Although defendant did not learn of the photocopying until it engaged in pretrial discovery, it reasoned that, under the after-acquired evidence doctrine, it would have been allowed to discharge plaintiff immediately had it learned of his activities at the time they occurred. (See *Camp* v. *Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 632 [41 Cal.Rptr.2d 329] [affirming summary judgment for employer based on after-acquired evidence that employees falsified employment applications].) The court did not rule on defendant's alternative ground, and defendant did not argue that ground in the Court of Appeal as an independent basis for affirming the summary judgment.

## C.  *An Overview of Wrongful Termination Cases*

This case requires us to restate and reaffirm our recent cases explaining what sources may be used to support a *Tameny* action as an exception to our statutory employment-at-will principle (§ 2922).

In *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 669 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*), we underscored the term "public" in *Tameny*'s public policy exception by observing that the employee's actions must further a policy affecting the public interest, which must be fundamental or substantial when the company discharges the employee. (*Foley, supra,* 47 Cal.3d at p. 670, fn. 11.) In rejecting a tort claim based on an employee's discharge after he reported to management his supervisor's history of embezzlement, we held that alleged violations of internal practices that affect only the employer's or employee's interest, and not the general public's interest, will not give rise to tort damages. (*Foley, supra,* 47 Cal.3d at pp. 669-671.) In other words, courts must focus not on compensation to employees, but rather on the "general social policies being advanced." (*Foley, supra,* 47 Cal.3d at p. 668.) Even then, not all statutes (or constitutional provisions) will support a *Tameny* claim. "[M]any statutes simply regulate conduct between private individuals, or impose requirements whose fulfillment does not implicate fundamental public policy concerns." (*Foley, supra,* 47 Cal.3d at p. 669.)

In discussing whether an employee's *Tameny* claim could state a discharge that actually implicated public policy, we held that "[t]he absence of a distinctly 'public' interest in this case is apparent when we consider that if an employer and employee were *expressly* to agree that the employee has no obligation to, and should not, inform the employer of any adverse information the employee learns about a fellow employee's background, nothing in the state's public policy would render such an agreement void. By contrast, in the previous cases asserting a discharge in violation of public policy, the public interest at stake was invariably one which could not properly be circumvented by agreement of the parties. For example, in *Tameny, supra,* 27 Cal.3d 167, a contract provision purporting to obligate the employee to comply with an order of the employer directing the employee to violate the antitrust laws would clearly have been void as against public policy. . . . Because here the employer and employee could have agreed that the employee had no duty to disclose such information, it cannot be said that an employer, in discharging an employee on this basis, violates a fundamental duty imposed on all employers for the protection of the public interest." (*Foley, supra,* 47 Cal.3d at pp. 670-671, fn. 12.)

In *Gantt,* we discussed further the requirements for a wrongful discharge claim alleging a public policy violation. *Gantt* considered whether an employee stated a cause of action for wrongful discharge against public policy

after his employer terminated him in retaliation for supporting a coworker's sexual harassment claim. (*Gantt, supra,* 1 Cal.4th at pp. 1087-1089.) The court recognized that public policy cases fall into one of four categories: the employee (1) refused to violate a statute; (2) performed a statutory obligation; (3) exercised a constitutional or statutory right or privilege; or (4) reported a statutory violation for the public's benefit. (*Id.* at pp. 1090-1091.) After observing that all four categories involved statutory provisions, *Gantt* allowed the plaintiff's claim, but specifically limited *Tameny's* application to those cases in which a plaintiff's public policy source is "tethered to" either a specific constitutional or statutory provision. (*Gantt, supra,* 1 Cal.4th at p. 1095.) *Gantt* also observed that, in order to provide an exception to section 2922's at-will mandate, the policy must be "public" in that it "affects society at large" rather than the individual, must have been articulated at the time of discharge, and must be " 'fundamental' " and " 'substantial.' " (*Gantt, supra,* 1 Cal.4th at p. 1090; see also *Stevenson, supra,* 16 Cal.4th at p. 890.)

*Gantt's* limitation on public policy sources (that they must be supported by either constitutional or statutory provisions) grew from our belief that " 'public policy' as a concept is notoriously resistant to precise definition, and that courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch" in order to avoid judicial policymaking. (*Gantt, supra,* 1 Cal.4th at p. 1095.)

Although *Gantt* did not address whether its rule includes governmental regulations adopted to implement particular constitutional or statutory provisions, the court did observe the considerable disparity existing between those states adopting broad views of the public policy exception and those applying a stricter limitation on how they define public policy.[4] (*Gantt, supra,* 1 Cal.4th at pp. 1092-1093.) Recognizing that " '[t]he term "public policy" is inherently not subject to precise definition,' " we interpreted the term to mean " ' "that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good. . . ." ' " (*Id.* at p. 1094, quoting *Safeway Stores* v. *Retail Clerks etc. Assn.* (1953) 41 Cal.2d 567, 575 [261 P.2d 721].)

■ In 1984, our Legislature provided "whistle-blower" protection in section 1102.5, subdivision (b), stating that an employer may not retaliate

---

[4]For example, the New Jersey Supreme Court favored broadly defining public policy exceptions: "The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy." (*Pierce* v. *Ortho Pharmaceutical Corp.* (1980) 84 N.J. 58 [417 A.2d 505, 512, 12 A.L.R.4th 520].) By contrast, the Michigan Supreme Court held that wrongful discharge tort actions must be based in public policies found in statutes or constitutional provisions. (*Suchodolski* v. *Michigan Consol. Gas Co.* (1982) 412 Mich. 692 [316 N.W.2d 710, 712].)

against an employee for disclosing a violation of state or federal regulation to a governmental or law enforcement agency. This provision reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation. Section 1102.5, subdivision (b), concerns employees who report to public agencies. It does not protect plaintiff, who reported his suspicions directly to his employer. Nonetheless, it does show the Legislature's interest in encouraging employees to report workplace activity that may violate important public policies that the Legislature has stated. The state's whistle-blower statute includes administrative regulations as a policy source for reporting an employer's wrongful acts and grants employees protection against retaliatory termination. Thus, our Legislature believes that fundamental public policies embodied in regulations are sufficiently important to justify encouraging employees to challenge employers who ignore those policies.

Like California, most sister states recognize a public policy exception to at-will employment.[5] Plaintiff relies on cases from other jurisdictions to support his contention that a public policy claim involving commercial airline safety may be grounded in administrative regulations that serve the statutory policy. (See *Pratt* v. *Brown Mach. Co.* (6th Cir. 1988) 855 F.2d 1225, 1237 [at-will employee not required to prove statutory violation for wrongful termination in violation of public policy, observing that statutes are "the legislative foundation upon which a cause of action of this nature could be implied"]; accord, *Johnston* v. *Del Mar Distributing Co.* (Tex.Ct.App. 1989) 776 S.W.2d 768, 772; *McQuary* v. *Bel Air Convalescent Home, Inc.* (1984) 69 Or.App. 107 [684 P.2d 21, 24].) Other cases are even more to the point. In *Anderson* v. *Evergreen Intern. Airlines, Inc.* (1994) 131 Or.App. 726 [886 P.2d 1068] (*Anderson*), an airline employer fired the plaintiff, a maintenance worker, when he refused to install a defective airline part. The plaintiff alleged the employer fired him for refusing to violate FAA safety regulations and for refusing to participate in the employer's attempt to cover up those violations. (*Id.* at pp. 1072-1073.) Noting that " '[A]ir safety ranks somewhere in pecking order between motherhood and the American flag,' " the court concluded the plaintiff's discharge for refusing to violate FAA regulations fell within the public policy exception to at-will employment. (*Id.* at p. 1073, fn. 8, quoting *F.A.A.* v. *Landy* (2d Cir. 1983) 705 F.2d 624,

---

[5]Several states do not recognize a public policy exception to the employment-at-will doctrine. (See, e.g., *Murphy* v. *American Home Products Corp.* (1983) 58 N.Y.2d 293 [461 N.Y.S.2d 232, 448 N.E.2d 86, 89] [refusing to recognize wrongful termination exception to at-will doctrine outside legislative declaration]; see also *Salter* v. *Alfa Ins. Co., Inc.* (Ala. 1990) 561 So.2d 1050, 1051-1053 [no exceptions to at-will rule]; *Perry* v. *Sears, Roebuck & Co.* (Miss. 1987) 508 So.2d 1086, 1089-1090 [same]; *Evans* v. *Bibb Co.* (1986) 178 Ga.App. 139 [342 S.E.2d 484, 485-486] [same]; *Smith* v. *Piezo Technology & Prof. Adm'rs* (Fla. 1983) 427 So.2d 182, 184 [same].)

637; see also *Adolphsen* v. *Hallmark Cards, Inc.* (Mo.Ct.App. 1995) 907 S.W.2d 333, 338-339 [regulations may support public policy claim if regulation involves clear public policy mandate]; *Pierce* v. *Ortho Pharmaceutical Corp., supra,* 417 A.2d at p. 512 [allowing at-will employee to base public policy claim on administrative rules and regulations]; but see *Winters* v. *Houston Chronicle Pub. Co.* (Tex. 1990) 795 S.W.2d 723, 723-724 [restricting public policy exceptions to cases involving employee's refusal to perform illegal acts or employer's deliberate attempt to avoid pension fund contribution].)

After *Gantt,* we decided several wrongful termination cases that refined and explained its reasoning, including *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1256-1257 [32 Cal.Rptr.2d 223, 876 P.2d 1022] (*Turner*). In *Turner,* the plaintiff had alleged, in part, that he was forced to resign from the company (i.e., he was constructively discharged) after complaining to management about violations of internal operating practices and the company's collective bargaining agreements. (*Id.* at pp. 1256-1257.) Without pointing to a statute or constitutional provision that applied directly to the defendant, the plaintiff made vague allegations that the defendant had violated the federal " 'Alcohol, Tobacco and Firearms laws.' " (*Id.* at p. 1257.) Although *Turner* was a constructive discharge case, it did reaffirm our view of what it takes to establish a claim for wrongful discharge in violation of fundamental public policy. (*Id.* at p. 1256.) Indeed, we held: "Assuming, as we must in a summary judgment posture, that [the plaintiff] could prove these claims at trial, none of them implicates a fundamental public policy embodied in a statute or constitutional provision. The tort of wrongful discharge is not a vehicle for enforcement of an employer's internal policies or the provisions of its agreements with others. [The plaintiff's] failure to identify a statutory or constitutional policy that would be thwarted by his alleged discharge dooms his cause of action." (*Id.* at p. 1257.)

In *General Dynamics Corp.* v. *Superior Court* (1994) 7 Cal.4th 1164 [32 Cal.Rptr.2d 1, 876 P.2d 487] (*General Dynamics*), we held that, under most circumstances, an in-house attorney could maintain "a retaliatory discharge claim against his or her employer . . . [if] the attorney was discharged for following a mandatory ethical obligation prescribed by professional rule or statute." (*Id.* at p. 1188.) Our reference to "professional rule" was specifically to the Rules of Professional Conduct, a code of conduct adopted pursuant to statute by the California State Bar with the approval of this court and binding on all attorneys in the state. (See Bus. & Prof. Code, §§ 6076, 6077.) Although *General Dynamics* did not specifically address how to reconcile its holding with our earlier pronouncements in *Gantt,* the court implicitly recognized that *Gantt*'s analysis would not exclude all *Tameny*

claims rooted in statutorily based administrative regulations. (*General Dynamics, supra,* 7 Cal.4th at p. 1180.)

In *Jennings* v. *Marralle* (1994) 8 Cal.4th 121 [32 Cal.Rptr.2d 275, 876 P.2d 1074] (*Jennings*), and *Stevenson, supra,* 16 Cal.4th at pages 892-894, we again narrowly defined what sources will provide fundamental public policy that limits an employer's ability to discharge an at-will employee. *Jennings* held that the Fair Employment and Housing Act's (FEHA) ban on age discrimination, which defines an employer as a person "regularly employing five or more persons," does not apply to an employer with fewer than five employees. (*Jennings, supra,* 8 Cal.4th at pp. 135-136; Gov. Code, § 12926, subd. (d).) We rejected the Court of Appeal's conclusion that, notwithstanding the exemption for small employers, the public policy expressed in the statute reflected a "fundamental" policy that would support a common law cause of action in violation of public policy under *Gantt, supra,* 1 Cal.4th at page 1095. (*Jennings, supra,* 8 Cal.4th at p. 133.) We observed that "the inclusion of age in the policy statement of the FEHA alone is not sufficient to establish a 'fundamental' public policy for the violation of which an employer may be held liable in a common law tort action. The Legislature's decision to exclude small employers from the FEHA and the omission of any other legislation barring discrimination on the basis of age precludes finding a fundamental policy that extends to age discrimination by small employers." (*Jennings, supra,* 8 Cal.4th at p. 135.)

In *Stevenson,* we concluded that the FEHA policy prohibiting age discrimination against older workers supported the plaintiff's *Tameny* claim after she was discharged by an employer who employed more than four persons. (*Stevenson, supra,* 16 Cal.4th at p. 885.) In allowing the claim, we expressly stated the reason courts must be careful not to extend a *Tameny* cause of action beyond policy based in either a constitutional or statutory provision: "In the context of a tort claim for wrongful discharge, tethering public policy to specific constitutional or statutory provisions serves not only to avoid judicial interference with the legislative domain, but also to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge . . . ." (*Stevenson, supra,* 16 Cal.4th at p. 889.)

■ Our review of the above cases makes clear that wrongful termination cases involving a *Tameny* cause of action are limited to those claims finding support in an important public policy based on a statutory or constitutional provision. (*Stevenson, supra,* 16 Cal.4th at pp. 888-890.) This limitation recognizes an employer's general discretion to discharge an at-will employee without cause under section 2922, and best serves the Legislature's goal to

give law-abiding employers broad discretion in making managerial decisions. It also acknowledges the fact that fundamental public policy may be enunciated in administrative regulations that serve the statutory objective. To acknowledge statutorily authorized regulations as evidence of public policy in retaliatory discharge actions is wholly consistent with the rationale for limiting these tort actions set forth in *Gantt, supra,* 1 Cal.4th at page 1095.[6] As noted above, one of the primary reasons for requiring the public policy that gives rise to a wrongful termination action to have "a basis in either constitutional or statutory provisions," is to limit "judicial policymaking" " 'lest [courts] mistake their own predilections for public policy which deserves recognition at law.' " (*Ibid.*) Contrary to the dissenting opinions, when courts discover public policy in regulations enacted under statutory authority, they are not "mistak[ing] their own predilections for public policy," but rather are recognizing a public policy that the Legislature has formulated and the executive branch has implemented. ▮ The question we now address is whether important public safety regulations governing commercial airline safety may provide a basis for declaring a public policy in the context of a retaliatory discharge action.

D.  *FAA Regulations*

Federal regulations promoting the proper manufacture and inspection of component airline parts advance the important public policy objectives we have discussed in the cases following *Tameny, supra,* 27 Cal.3d 167. In the Federal Aviation Act of 1958 (49 U.S.C. former appen. § 1301 et seq., now § 40101 et seq.), Congress declared the public interest in commercial air safety in 49 United States Code section 44701: "(a) . . . The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce by prescribing— [¶] (1) minimum standards required in the interest of safety for . . . the design, material, construction, quality of work, and performance of aircraft . . . ." In other provisions, Congress authorized the federal government to supervise closely the design and manufacture of aircraft or component aircraft parts. (49 U.S.C. § 44704(a), (b) [establishing a system of certificates manufacturers must obtain from the FAA to produce aircraft or aircraft components].) The FAA, in turn, used the congressional grant of authority to establish an intricate regulatory scheme in order to ensure that aircraft design meets safety standards and aircraft manufacture conforms to the design. Regulations require prime manufacturers (such as Boeing) to establish quality control inspection systems for

---

[6]To the extent one can read *Gantt, supra,* 1 Cal.4th at page 1095, to conclude that important administrative regulations implementing fundamental public policies as reflected in their enabling statutes are not "tethered to" legislative enactments, we overrule it. We emphasize, however, that our holding does not include any other potential sources of policy not discussed here or in any of our cases following *Gantt.*

components they produce and ensure their subcontractors (such as defendant) do the same. "(a) Each [prime manufacturer] must submit, for approval, data describing the inspection and test procedures necessary to ensure that each article produced conforms to the type design and is in a condition for safe operation, including as applicable . . . [¶] . . . [¶] (2) A description of inspection procedures for . . . parts and assemblies produced by manufacturers' suppliers [such as defendant] including methods used to ensure acceptable quality of parts and assemblies that cannot be completely inspected for conformity and quality when delivered to the prime manufacturer's plant; [¶] . . . [¶] (b) Each prime manufacturer shall make available to the Administrator information regarding all delegation of authority to suppliers [such as defendant] to make major inspections of parts or assemblies for which the prime manufacturer is responsible." (14 C.F.R. § 21.143 (1998).)

In *United States* v. *Varig Airlines* (1984) 467 U.S. 797 [104 S.Ct. 2755, 81 L.Ed.2d 660] (*Varig*), the high court recognized the importance of this regulatory scheme. It approved congressional delegation to the FAA of authority to promulgate regulations and the concomitant FAA regulatory prerogative. In *Varig,* a commercial aircraft owner sued the United States under the Federal Tort Claims Act seeking damages for a destroyed aircraft. The court held the discretionary function exception to the Federal Tort Claims Act precluded tort actions based on the FAA's alleged negligence in failing to check certain items in the course of certifying commercial airplanes. (*Varig, supra,* 467 U.S. at pp. 819-820 [104 S.Ct. at pp. 2767-2768].) The court also stated that "the Secretary of Transportation has the duty to promote safety in air transportation by promulgating reasonable rules and regulations governing the inspection, servicing, and overhaul of civil aircraft." (*Id.* at p. 816 [104 S.Ct. at pp. 2765-2766].)

More importantly, *Varig* held that "[i]n the exercise of this discretion, the FAA, as the Secretary's designee, has devised a system of compliance review that involves certification of aircraft design and manufacture at several stages of production. [Citation.] The FAA certification process is founded upon a relatively simple notion: the duty to ensure that an aircraft conforms to FAA safety regulations lies with the manufacturer and operator, while the FAA retains the responsibility for policing compliance. Thus, the manufacturer is required to develop the plans and specifications and perform the inspections and tests necessary to establish that an aircraft design comports with the applicable regulations . . . ." (*Varig, supra,* 467 U.S. at pp. 816-817 [104 S.Ct. at p. 2766], fn. omitted.)

That Congress delegated to the FAA regulatory power in the commercial aircraft safety context is not unusual or surprising. A substantial body of

law, advancing significant public policy objectives, is found in administrative regulations that promulgate important legislative objectives. This is especially true of laws pertaining to the protection of public health and safety. (See, e.g., 42 U.S.C. § 300g et seq. [delegating to the Administrator of the Environmental Protection Agency the authority to issue safe drinking water regulations]; Health & Saf. Code, § 1275, subd. (a) [authorizing Department of Health Services to promulgate regulations for health facilities]; Health & Saf. Code, § 25150, subd. (a) [authorizing the Department of Toxic Substances Control to promulgate regulations regarding hazardous waste disposal].) The United States Supreme Court has stated that the development of its jurisprudence regarding congressional delegation of rule-making authority to administrative and executive agencies "has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." (*Mistretta* v. *United States* (1989) 488 U.S. 361, 372 [109 S.Ct. 647, 654-655, 102 L.Ed.2d 714].)

■ In California, administrative agencies routinely adopt quasi-legislative regulations under express statutory authority. For such regulations to be valid in this state, they must be consistent "with the terms or intent of the authorizing statute." (*California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2].) A valid regulation must also be "reasonably necessary to effectuate the statutory purpose" of its authorizing legislation. (*Ibid.*) Federal law is similar. (See *Chevron U.S.A.* v. *Natural Res. Def. Council* (1984) 467 U.S. 837, 842-845 [104 S.Ct. 2778, 2781-2783, 81 L.Ed.2d 694].) It therefore follows that if a statute that seeks to further a public policy objective delegates the authority to adopt administrative regulations to an administrative agency in order to fulfill that objective, and that agency adopts regulations that are within the scope of its statutory authority and effectuate the statutory policy, then those regulations may be manifestations of important public policy.

■ Plaintiff performed the FAA-required inspections on the parts intended for use in Boeing aircraft to further a fundamental public policy: "to ensure that each article produced conforms to the type design and is in a condition for safe operation." (14 C.F.R. § 21.143(a) (1998).) Therefore, this regulation-based fundamental public policy may serve as the foundation for plaintiff's *Tameny* claim. It furthers important safety policies affecting the public at large and does not merely serve either the employee's or employer's personal or proprietary interest. (*Foley, supra,* 47 Cal.3d at pp. 669-671.) As we have noted, " ' "[t]here is no public policy more important or more fundamental than the one favoring the effective protection of the lives

and property of citizens." ' " (*General Dynamics, supra,* 7 Cal.4th at p. 1183.)

### E. *Defendant's Claims*

#### 1. *Alleged procedural deficiencies*

■ As defendant observes, in wrongful termination cases we have rejected public policy claims that were "largely unaccompanied by citations to specific statutory or constitutional provisions." (*Turner, supra,* 7 Cal.4th at p. 1257.) We observed that the omission "puts [the defendant] and the court in the position of having to guess at the nature of the public policies involved, if any. This kind of showing is plainly insufficient to create an issue of *material* fact justifying a trial on the merits of [the plaintiff's] claims." (*Ibid.*, fn. omitted.) Defendant contends that under *Turner*, the Court of Appeal erred in reversing its summary judgment motion because plaintiff failed to identify a specific statute supporting his wrongful termination claim until he filed his opposition to defendant's motion. Even then, defendant asserts, plaintiff did not identify the statutes on which he relied, instead citing to the entire Federal Aviation Act and the Code of Federal Regulations without explaining their application to his case. Defendant contends that the Court of Appeal should have required plaintiff to specify his claim's statutory basis in his original complaint, or, at the very least, in his responses to discovery. Defendant claims that, without a specific statute or constitutional provision upon which to base his claim, plaintiff's case was deficient as a matter of law and warranted summary judgment. (See *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 580-581 [37 Cal.Rptr.2d 653].)[7]

After engaging in independent research, the Court of Appeal identified the regulations on which plaintiff now relies and requested supplemental briefing on whether those regulations could form the basis for plaintiff's public

---

[7]Defendant observes that *Turner* suggests plaintiffs should specify the statutory provisions on which they rely no later than at the summary judgment stage. (*Turner, supra,* 7 Cal.4th at p. 1257.) As noted, the Court of Appeal did find that plaintiff adequately identified the statutes and regulations supporting his public policy claim in his opposition to defendant's summary judgment motion. Accordingly, we need not decide here the precise time at which a plaintiff must identify the particular statutes forming the basis of a *Tameny* claim. Clearly, a claim that does not identify the basis of its wrongful termination allegations will not prevail on summary judgment.

Defendant also contends that plaintiff's opposition to the summary judgment motion failed to conform to Code of Civil Procedure section 437c because plaintiff filed it six days late and did not file a responsive separate statement of undisputed facts. Defendant raised these issues in the trial court, but the Court of Appeal did not address them, apparently concluding they did not represent material procedural defects in plaintiff's opposition to the motion. Because defendant did not call the issues to the court's attention in a petition for rehearing, we do not consider them here. (Cal. Rules of Court, rule 29(b)(2).)

policy claim. Defendant did not argue in the Court of Appeal that plaintiff should have specified the statutory basis for his claim in his complaint, and the court did not address that issue. The court considered defendant's claim that plaintiff failed to produce the appropriate statutes or regulations to support his action at the summary judgment stage, but concluded that plaintiff had adequately identified several relevant FAA regulations as part of his opposition to summary judgment. Thus, the Court of Appeal properly held that plaintiff had met his burden to provide the specific statutes and regulations on which he based his claim.

### 2. *Balancing public policy and legislative province*

Defendant contends that including regulations as a potential public policy source does not strike the proper balance between employer and employee that our cases require. (See, e.g., *Stevenson, supra,* 16 Cal.4th at p. 889.) Defendant claims that it is improper to assume employers are aware of the fine details of administrative regulations. (See, e.g., *Sequoia Ins. Co.* v. *Superior Court* (1993) 13 Cal.App.4th 1472, 1480 [16 Cal.Rptr.2d 888] [refusing to allow wrongful discharge action where there was no expression of the policy anywhere in the codes under which employer operated its business].)

As plaintiff correctly observes, however, no reasonable parts manufacturer could read the applicable federal regulations and believe it was free to supply defective parts to airline companies. Moreover, by allowing employees to rely on regulations that are supported by the important policies of the Federal Aviation Act, we satisfy our goal to balance the competing interests by (1) providing the employer with proper warning it is violating fundamental public policies, (2) ensuring employees are protected against employer actions that contravene fundamental policy, and (3) guaranteeing to the public that employers' interests will not be protected at the expense of society's most important policies. (See *Gantt, supra,* 1 Cal.4th at pp. 1090-1091; *Foley, supra,* 47 Cal.3d at pp. 669-671.)

### 3. *The FAA regulations' effect on the public at large*

Defendant also contends that the particular administrative regulations here affect only the personal or proprietary interests of employers who apply for certification and do not inure to the public's benefit. Thus, defendant claims, no public interest exists to justify plaintiff's claim. (*Foley, supra,* 47 Cal.3d at pp. 670-671, fn. 12.) Defendant asserts the provisions are not "firmly established," "fundamental," and "substantial" as *Tameny* requires (*Tameny, supra,* 27 Cal.3d at pp. 172, 176-177), but are merely procedural because the

regulations apparently involve the " 'procedural requirements for the issue of type certificates.' " We disagree.

The critical distinction between the facts here and those at issue in *Foley, supra,* 47 Cal.3d at pages 670-671, footnote 12, is that there the violations of internal practices affected only the employer's interest, while here defendant's alleged misconduct potentially jeopardized airline passenger safety. Protecting airline passengers, therefore, is the relevant fundamental public policy at issue. Promoting airline safety—the subject of the federal regulations—constitutes a policy of sufficient public importance. As plaintiff points out, travel by any common carrier inevitably concerns the public, because a common carrier's mistake or a manufacturer's defective part can cause multiple casualties. Thus, the public policy that is the foundation for plaintiff's case not only satisfies *Foley*'s requirement for a "public" interest, but also *Tameny*'s requirement for a "fundamental" policy interest. (*Foley, supra,* 47 Cal.3d at p. 670; *Tameny, supra,* 27 Cal.3d at p. 176.)

### 4. *Notice of federal law violations*

Defendant claims that even if we allow a public policy claim based on specific regulatory violations, plaintiff's case fails because his complaints focused on defendant's internal practices and procedures, and because he did not give defendant proper notice that it violated any federal law.

We cannot agree. By informing defendant that he believed it was shipping defective parts for use in passenger aircraft, plaintiff gave defendant adequate notice that his concern involved potentially significant public policy matters because the FAA requires manufacturers to establish quality control procedures for the component parts they produce. (14 C.F.R. § 21.143 (1998).) Thus, unlike some cases in which an employer's violation of its own internal procedures does not implicate public policy (see, e.g., *Turner, supra,* 7 Cal.4th at p. 1257), the internal quality control procedures at issue in this case are part of a statutory and regulatory scheme established by Congress and the FAA, designed to ensure the manufacture of safe aircraft.

### 5. *Violation of FAA regulations*

Defendant next attempts to refute plaintiff's wrongful termination claim on the ground that plaintiff failed to prove defendant actually violated any law, including the FAA regulations, or that defendant's alleged inadequate inspection practices were, in fact, hazardous. Defendant specifically relies on *Jennings,* in which we held that the FEHA statutory ban on age discrimination was "inseparable from . . . the legislative statement of policy" (*Jennings, supra,* 8 Cal.4th at p. 125), and that "[i]t would be unreasonable to

expect employers who are expressly exempted from the FEHA ban on age discrimination to nonetheless realize that they must comply with the law from which they are exempted under pain of possible tort liability." (*Id.* at pp. 135-136.) In *Jennings,* however, we observed that "[t]he absence of an FEHA remedy would not negate the existence of a common law tort remedy if another law created the right on which this action is predicated." (*Id.* at p. 130.)

Here, plaintiff predicated his action on the important public policy Congress declared when it enacted the Federal Aviation Act. (49 U.S.C. § 44101; *In re Air Crash Disaster Near Silver Plume, Colo.* (D.Kan. 1977) 445 F.Supp. 384, 400 [Congress's intent in enacting the act was to improve air safety and to prevent or reduce tragic aviation accidents.].) The significant safety regulations that the FAA promulgated to implement the act, which require prime manufacturers to establish detailed inspection systems for components they produce and to ensure that their subcontractors or suppliers do the same, are potentially implicated here. (14 C.F.R. § 21.143 (1998).) Whether or not plaintiff can prove his allegations at trial is not for us to determine.

To the extent defendant also claims that the FAA regulations do not even apply to its operations because it apparently never applied for certification under the FAA provisions, its argument also fails at the summary judgment stage of proceedings. If plaintiff's allegations are true, then defendant arguably misrepresented the safety of the parts shipped to prime manufacturers such as Boeing, on which information these manufacturers would foreseeably rely for their own certification program, causing these manufacturers to submit to the FAA information that would have misrepresented the safety and soundness of some airplane parts. Therefore, whether or not defendant itself was applying for certification, there can be no question that any representations it made that caused the certification of an airplane with defective parts was a breach of a fundamental public policy as evidenced in a federal regulation. (See *United States* v. *Steiner Plastics Mfg. Co.* (2d Cir. 1956) 231 F.2d 149, 151-152 [airplane subcontractor that delivered a number of cockpits to the aircraft assembly company with false approval certificates attached, thereby implying they had passed inspection, violated statutory government fraud provisions (18 U.S.C. § 1001) even without proof the cockpits were in any way defective].)

Accordingly, as the Court of Appeal stated: "The fact [the inspections] were performed by [defendant] as a 'manufacturer's supplier' rather than by Boeing as a 'prime' manufacturer does not mean they were any less important to the public policy favoring safe manufacture of passenger aircraft. Nor

does it mean the honest performance of those inspections was not 'tethered to' the statutes establishing that policy and authorizing the FAA to promulgate regulations furthering that policy. No reasonable component manufacturer could read those regulations and believe it was free to supply parts which failed inspection or could perform inspections that failed to meet the standards established by 'prime manufacturers,' e.g., aircraft assembly companies such as Boeing."

Moreover, as the Court of Appeal has held, an employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his "reasonably based suspicions" of illegal activity. (See *Collier* v. *Superior Court* (1991) 228 Cal.App.3d 1117, 1125 [279 Cal.Rptr. 453] (*Collier*) ["An agreement prohibiting an employee from informing anyone in the employer's organization about reasonably based suspicions of ongoing criminal conduct . . . would be a disservice . . . to the interests of the public and would therefore present serious public policy concerns not present in *Foley*." (Fn. omitted.)].)

Thus, though it may be unclear whether defendant, as a subcontractor or supplier, legally violated the FAA regulations, its alleged conduct in shipping nonconforming parts to an aircraft manufacturer violated the public policies embodied in the regulations. In other words, defendant's alleged conduct may have contravened the fundamental well-established policy "delineated in" the act and its regulations. (*Gantt, supra,* 1 Cal.4th at p. 1095.) That the FAA's regulations place the burden on prime manufactures to establish quality control inspections systems, and not on subcontractors, does not imply that subcontractors may undermine or ignore the regulations by shipping allegedly defective parts to prime manufacturers. Therefore, plaintiff's suspicion that defendant's conduct may have violated the act and its regulations was certainly "reasonably based." (*Collier, supra,* 228 Cal.App.3d at p. 1125.)

### 6. *Nature of plaintiff's claim*

Defendant next insists that, because the regulations and statute on which plaintiff relies are wholly federal in nature, we should not "extend the common law public policy tort doctrine" to defendant's alleged federal law violations. Defendant also asserts that we should bar plaintiff's claim because neither the Federal Aviation Act nor the implementing regulations contain a provision prohibiting an employee's retaliatory termination, nor do they provide for private civil damages. Defendant's arguments are without merit. As plaintiff notes, *Gantt* holds employers responsible for knowing "the fundamental public policies of the state *and nation*." (*Gantt, supra,* 1

Cal.4th at p. 1095, italics added.) In *Tameny, supra,* 27 Cal.3d at page 170, federal antitrust laws formed, in part, the basis for the wrongful termination claim.

The Court of Appeals of Oregon rejected a similar preemption argument in *Anderson, supra,* 886 P.2d at pages 1070-1072. *Anderson* observed that the Federal Aviation Act specifically states, " 'Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.' " (*Anderson, supra,* 886 P.2d at p. 1070, quoting 49 U.S.C. former appen. § 1506.) When Congress amended the act in 1978, it retained the saving clause. (49 U.S.C. former appen. § 1305(a)(1).) *Anderson* also observed that the Federal Aviation Act provides no remedy for wrongful discharge, and it concluded that plaintiffs would have no remedy for a wrongful termination if the preemption doctrine barred them from bringing a state-law-based wrongful discharge claim. (*Anderson, supra,* 886 P.2d at pp. 1071-1072.)

### 7. *Federal law and wrongful termination*

Defendant relies on several federal decisions that decline to recognize an "implied right of action" directly or impliedly based on the breach of a duty stated in a federal statute, particularly where the statute already provides a remedy. (See, e.g., *Virginia Bankshares, Inc.* v. *Sandberg* (1991) 501 U.S. 1083, 1087 [111 S.Ct. 2749, 2755, 115 L.Ed.2d 929] [false statements in proxy solicitation]; *Thompson* v. *Thompson* (1988) 484 U.S. 174, 178-179 [108 S.Ct. 513, 515-516, 98 L.Ed.2d 512] [Parental Kidnaping Prevention Act]; *Pavolini* v. *Bard-Air Corp.* (2d Cir. 1981) 645 F.2d 144, 145-146 [Federal Aviation Act provides no implied federal cause of action or remedy for wrongful discharge of private party].) As plaintiff observes, however, these cases are inapposite; they do not address the common law public policy exception to the at-will employment doctrine.

### 8. *California's public policy doctrine and plaintiff's claim*

Defendant observes that California's public policy doctrine is designed to advance "general social policies," and not to compensate employees for specific violations. (*Foley, supra,* 47 Cal.3d at p. 668.) Defendant contends that California's interest in providing a private cause of action is to enforce the statute, not to regulate the employment relationship. Thus, defendant asserts, the policies underlying federal statutes, and the Federal Aviation Act in particular, are neither "substantial" nor "fundamental" enough to support plaintiff's wrongful termination action. (*Foley, supra,* 47 Cal.3d at pp. 668, 670.)

Plaintiff notes that the cases on which defendant relies ignore the strong congruence between state and federal public policy involving air safety. (See, e.g., *Olguin* v. *Inspiration Consol. Copper Co.* (9th Cir. 1984) 740 F.2d 1468 (*Olguin*); *Tritle* v. *Crown Airways, Inc.* (S.D.W.Va. 1989) 751 F.Supp. 585 (*Tritle*); *Rachford* v. *Evergreen Intern. Airlines, Inc.* (N.D.Ill. 1984) 596 F.Supp. 384 (*Rachford*).) As plaintiff observes, *Olguin* turns primarily on federal preemption and only incidentally discusses the public policy exception, while *Tritle* and *Rachford* merely follow *Olguin*, with no independent analysis. (See *Olguin, supra*, 740 F.2d at p. 1475; *Tritle, supra*, 751 F.Supp. at p. 585; *Rachford, supra*, 596 F.Supp. at p. 385.) Moreover, numerous cases support plaintiff's claim that a wrongful termination claim involving airline safety may stem from federal law. (See, e.g., *Air Lines Pilots Association, International* v. *Quesada* (2d Cir. 1960) 276 F.2d 892, 894 [Federal Aviation Act's purpose was to centralize, in a single authority, rulemaking power regarding safe and efficient airspace use]; *Norris* v. *Hawaiian Airlines, Inc.* (1992) 74 Hawaii 235 [842 P.2d 634, 646], affd. on other issues in *Hawaiian Airlines, Inc.* v. *Norris* (1994) 512 U.S. 246 [114 S.Ct. 2239, 129 L.Ed.2d 203] [airline employee discharged for reporting to the FAA discrepancies in his employer's aircraft maintenance activities was protected against retaliatory discharge because of the state's significant interest in avoiding harm to the flying public].)

9. *Separation of powers doctrine*

Defendant next contends that the separation of powers doctrine prevents the court from creating a public policy exception here because the California Legislature alone is responsible for creating new public policy. Although defendant concedes that we may recognize a public policy exists in the absence of a legislative declaration (*Safeway Stores* v. *Retail Clerks etc. Assn., supra*, 41 Cal.2d at p. 574), it nevertheless asserts that the Legislature spoke on the subject when it addressed at-will employment in section 2922. In other words, defendant seems to assert that extending *Tameny, supra*, 27 Cal.3d 167, to include "federal" public policy regarding aviation safety would effectively abrogate section 2922.

We disagree. When employers are charged with violating a fundamental public policy grounded in federal law, our cases do not require the state Legislature to have enacted an identical statute prohibiting the precise conduct alleged. (*Gantt, supra*, 1 Cal.4th at p. 1095.)

██ We emphasize that not all administrative regulations can support such claims, but only those that implicate substantial public policies. As *Foley* demonstrated, it is insufficient for employees to allege that they were

discharged for refusing to violate a statute or follow a statutory duty; they must also allege that the statute in question was designed to protect the public or advance some substantial public policy goal. (*Foley, supra,* 47 Cal.3d at p. 670.) Employees must do the same when alleging a discharge for refusing to follow administrative regulations that implement an important statutory objective. In the case of both statutes and regulations based on statutes, courts must distinguish between those that promote a "clearly mandated public policy" and those that do not. (See *Foley, supra,* 47 Cal.3d at p. 670, fn. 11.) Contrary to the dissents, we are confident courts will continue to be able to make that distinction.

## CONCLUSION

We conclude that the public policy behind federal regulations concerning airline safety has a basis in statutory provisions, consistent with our rule that the public policy giving rise to a wrongful termination action have a basis in a constitutional or statutory provision. (*Gantt, supra,* 1 Cal.4th at p. 1095.) Congress has specifically directed the FAA to "assign[], maintain[], and enhanc[e] safety and security as the highest priorities in air commerce" and to regulate air commerce "in a way that best promotes safety." (49 U.S.C. § 40101(d)(1), (2).) Our judicial decisions favor protecting employees who vindicate important public policy interests. (See *Stevenson, supra,* 16 Cal.4th 880; *Tameny, supra,* 27 Cal.3d 167.) Allowing defendant to discharge plaintiff with impunity after he sought to halt or eliminate its alleged inspection practices would only undermine the important and fundamental public policy favoring safe air travel. By including significant administrative safety regulations promulgated to serve important FAA mandates as a source of fundamental public policy limiting an employer's right to discharge an otherwise at-will employee, we effectively guarantee that employers do not exercise their right to terminate their employees at will in a way that undermines more important public safety objectives. Accordingly, we affirm the Court of Appeal judgment and remand the matter for proceedings consistent with this decision.

George, C. J., Mosk, J., and Werdegar, J., concurred.

**KENNARD, J.**—I concur in the judgment and in the overruling of this court's decision in *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083 [4 Cal.Rptr.2d 874, 824 P.2d 680] (*Gantt*) insofar as it held that a cause of action for wrongful termination in violation of public policy may not be based on a public policy expressed in a validly enacted regulation, but only on a public policy articulated in a statutory or constitutional provision. For the reasons stated in my concurring and dissenting opinion in *Gantt* (*id.* at p.

1101), I remain of the view that a discharged employee should be permitted to recover tort damages for wrongful termination whenever the employer's action in discharging the employee violated a fundamental public policy delineated in existing law, regardless of the source of that law, including fundamental public policies delineated in administrative regulations and judicial decisions.

**BAXTER, J.**—I respectfully dissent.

For the past number of years, this court strove to contribute to a stable employment environment in California by holding that the public policy exception to the statutory right of employers to terminate employment at will (Lab. Code, § 2922[1] ) was a *narrow* one, dependent upon those fundamental public policies delineated in constitutional and statutory provisions. Today, the majority abruptly change course and dramatically expand the contours of the so-called *"Tameny"* claim (see *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]) to include public policies supposedly expressed in statutorily authorized administrative regulations. While this, in itself, raises significant concerns of notice and burden to employers given the vast number of such regulations, what is particularly alarming about today's decision is that a fired employee may assert the public policy exception based upon administrative regulations that do not even apply to the employer but instead regulate the conduct of entities doing business with the employer. Not surprisingly, the majority are unable to articulate any meaningful criteria for determining when a particular regulatory policy is both fundamental and sufficiently directed to a particular employer's conduct to support a wrongful discharge claim. The result is a standardless rule that unfairly burdens employers and allows judges to enforce their own predilections for public policy whenever they can find some regulatory expression on the subject.

In *Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083 [4 Cal.Rptr.2d 874, 824 P.2d 680] (*Gantt*), this court held in no uncertain terms that the public policy exception to the right of an employer to terminate an employee at will must be found in either a constitutional or statutory provision. (*Gantt, supra,* 1 Cal.4th at p. 1095.) Our decision to impose that limitation was driven by the concern, shared by a number of jurisdictions, that the concept of public policy is "notoriously resistant to precise definition." (*Ibid.*) We determined that the vagueness of public policy as a concept was problematic for at least two reasons. First, individual judges could mistake their own predilections for public policy deserving recognition at law if courts were allowed to declare public policy absent some prior legislative expression on the subject.

---

[1]All further statutory references are to this code unless otherwise specified.

(*Ibid.*) Second, employers had a legitimate interest in having the tort of wrongful discharge clearly defined and suitably controlled. (See 1 Cal.4th at pp. 1092, 1095.)

After due consideration of the conflicting decisional law and the competing interests at stake, this court rejected a broad approach and instead concluded that "[a] public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; *so limited*, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded." (*Gantt, supra*, 1 Cal.4th at p. 1095, italics added.)

Until today, we have followed *Gantt* consistently and have never questioned its conclusion that only a termination in violation of a fundamental public policy expressed in a statute or a constitutional provision would support a wrongful discharge action. (See *Stevenson* v. *Superior Court* (1997) 16 Cal.4th 880, 889 [66 Cal.Rptr.2d 888, 941 P.2d 1157] (*Stevenson*); *Jennings* v. *Marralle* (1994) 8 Cal.4th 121, 130 [32 Cal.Rptr.2d 275, 876 P.2d 1074] (*Jennings*); *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1257 [32 Cal.Rptr.2d 223, 876 P.2d 1022] (*Turner*); *Hunter* v. *Up-Right, Inc.* (1993) 6 Cal.4th 1174, 1186 [26 Cal.Rptr.2d 8, 864 P.2d 88].) Just last year, we emphasized yet again that "tethering public policy to specific constitutional or statutory provisions serves not only to avoid judicial interference with the legislative domain, but also to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge . . . ." (*Stevenson, supra*, 16 Cal.4th at p. 889.)[2]

So much for precedent. Today's decision dispenses with *Gantt*'s carefully considered limits and years of established case law. Henceforth, a *Tameny*

[2]*General Dynamics Corp.* v. *Superior Court* (1994) 7 Cal.4th 1164 [32 Cal.Rptr.2d 1, 876 P.2d 487] (*General Dynamics*) did not address the applicability of *Gantt*'s rule limiting public policy sources to constitutional and legislative provisions. To the extent the majority rely on *General Dynamics* to suggest that *Gantt*'s analysis did not exclude statutorily based administrative regulations as possible public policy sources, they are wrong. (See *Gantt, supra*, 1 Cal.4th at p. 1104 (conc. and dis. opn. of Kennard, J.).) Moreover, any confusion caused by *General Dynamics* was quickly dispelled by our subsequent statements in *Stevenson, Jennings* and *Turner*.

claim may be predicated upon expressions of public policy contained in a wide array of statutorily authorized regulations, whether or not related to public safety concerns,[3] that do not even purport to regulate the conduct of the particular employer. But by choosing to "untether" the exception from fundamental public policies as directly expressed in constitutional and statutory provisions, the majority succeed in committing the precise sins that *Gantt* sought to avoid. Not only do they create a rule that fails to respect the legitimate interests of employers but they also interfere with legislative policy in doing so.

Under today's rule, employers are deprived of adequate notice as to what conduct negates their right to terminate an at-will employee and exposes them to tort liability. As regulated employers are keenly aware, it is no small feat to keep abreast of all administrative regulations that govern their actions. Now, however, both regulated and nonregulated employers alike are expected to keep themselves fully informed of regulatory schemes applying to others. That is precisely the situation here. (14 C.F.R. § 21.143 (1998) [Federal Aviation Administration's (FAA) certification procedures requiring *prime manufacturers* to submit data describing quality control inspection procedures].)

This court has already acknowledged the obvious lack of warning to employers with respect to regulatory *statutes* that do not apply to them: "It would be unreasonable to expect employers" to "realize that they must comply with the law from which they are exempted under pain of possible tort liability." (*Jennings, supra,* 8 Cal.4th at pp. 135-136.) Given the multitude of administrative regulations that are "routinely adopt[ed]" under express statutory authority (see maj. opn., *ante,* at p. 82), it is even more unreasonable and more inequitable to expect employers to know that the at-will nature of their employment relationships may be destroyed by rules that do not even regulate their conduct.

To justify their holding, the majority reason that "no reasonable parts manufacturer *could read the applicable federal regulations* and believe it was free to supply defective parts to airline companies." (Maj. opn., *ante,* at p. 84, italics added.) The majority also conclude that "[b]y informing defendant that he believed it was shipping defective parts for use in passenger aircraft, plaintiff gave defendant adequate notice that his concern involved potentially significant public policy matters *because the FAA requires manufacturers to establish quality control procedures for the component parts they*

---

[3]Although the instant case involves what the majority describe as "regulations promulgated to address important public safety concerns" (maj. opn., *ante,* at p. 74), their overruling of *Gantt* is absolute with respect to statutorily authorized regulations (maj. opn., *ante,* at p. 80, fn. 6). Accordingly, any "fundamental" regulatory policy affecting the public interest may now qualify as a basis for the public policy exception.

*produce.*" (Maj. opn., *ante*, at p. 85, italics added.) Yet the majority never explain why a parts supplier such as defendant should have thought to focus upon a regulation pertaining to FAA certification and oversight of prime manufacturers. Indeed, the majority apparently are unable to identify any FAA regulation applicable to parts suppliers.[4]

As the foregoing suggests, the majority fail to articulate any objective criteria or standards to determine when a regulatory provision sufficiently expresses a fundamental public policy with respect to a particular employer. At most, the facts and analysis in this case indicate that employees may negate the at-will nature of their employment simply by complaining to their superiors about breaches of contracts with regulated third party entities.[5] Such a result, however, is directly contrary to our previous holding that "[t]he tort of wrongful discharge is not a vehicle for enforcement of an employer's internal policies or the provisions of its agreements with others." (*Turner, supra*, 7 Cal.4th at p. 1257.)

The ramifications of today's decision are ominous. Employers, to avoid exposure to *Tameny* claims, must familiarize themselves with all statutorily authorized regulations of the nation and state applying to all of the entities with which they contract, as well as all such regulations applying to their own particular industries. The resulting burden to employers is tremendous and cannot be denied. Indeed, the majority make no attempt to do so.

Just as troubling is the majority's intrusion upon the legislative domain in diminishing the statutory right of employers to terminate employees at will in the absence of any legislatively expressed fundamental public policy to

---

[4]Although the majority vaguely claim that "[p]laintiff performed the *FAA-required* inspections on the parts intended for use in Boeing aircraft" (maj. opn., *ante*, at p. 82, italics added) and that the "internal quality control procedures at issue in this case *are part of* a statutory and regulatory scheme established by Congress and the FAA" (*id.* at p. 85, italics added), the record is devoid of any evidence supporting such claims. Plaintiff did not submit any evidence to counter defendant's evidence that it was "*not* subject to *any* statutory or regulatory authority with respect to its inspection practices and documents," and the most plaintiff has claimed is that Boeing ended its business relationship with defendant as a result of plaintiff's post-termination complaints. (See *post*, fn. 5.) Noticeably missing is any legal authority or evidence showing that the FAA considers parts suppliers such as defendant to be subject to its oversight.

[5]In addition to the facts recited by the majority, other evidence in the record shows that after plaintiff was fired he informed Boeing about defendant's alleged shipping of "discrepant" parts. But the only reported consequence of plaintiff's disclosure is that Boeing removed defendant from its list of approved suppliers. Plaintiff does not claim, and the record does not show, that the FAA ever investigated defendant's practices or that it attempted to ban or discourage prime manufacturers from contracting with defendant. In short, the only demonstrated outcome of plaintiff's complaints was that a private business relationship between two commercial entities was terminated.

the contrary. I do not agree with the majority that section 1102.5[6] justifies their extension of the public policy exception to administrative regulations where, as here, the employee fails to report his suspicions to a governmental or law enforcement agency. (See maj. opn., *ante*, at p. 77.) In enacting section 1102.5, the Legislature made a policy judgment that employees deserve protection from employer retaliation when they go so far as to contact a public agency that will enforce the public's interest on the matter. Unlike the majority, I see no basis for second-guessing that legislative judgment in a way that will otherwise allow regulatory violations to remain hidden from the view of public officials.

Setting aside any policy debate over the necessity of public disclosure, I observe that, even assuming for purposes of argument that the "quasi-legislative" expression of public policy in an administrative regulation deserves consideration equal to a statutory expression of policy for purposes of negating at-will employment, and even assuming that the FAA regulation at issue manifests a public policy that is fundamental, the majority overreach in finding that the regulatory policy extends to the defendant employer here.

As the majority acknowledge, "Congress has specifically directed *the FAA* to 'assign[], maintain[], and enhanc[e] safety and security as the highest priorities in air commerce' and to regulate air commerce 'in a way that best promotes its . . . safety.' (49 U.S.C. § 40101(d)(1), (2).)" (Maj. opn., *ante*, at p. 90, italics added.) Following that directive, the FAA promulgated a regulation that requires prime manufacturers such as Boeing and Northrup to submit data describing quality control inspection procedures for airline parts and assemblies. (14 C.F.R. § 21.143 (1998).) The FAA has made clear, however, that the duty to ensure aircraft conformity with FAA safety regulations lies with the prime manufacturer, not suppliers such as defendant here. (*Ibid.*; see *United States* v. *Varig Airlines* (1984) 467 U.S. 797, 816-817 [104 S.Ct. 2755, 2765-2766, 81 L.Ed.2d 660].)

Since the FAA determined that the public interest in ensuring quality control is best served by its oversight of prime manufacturers, it is presumptuous, to say the least, for this court to find in the subject regulation a fundamental public policy that extends to employers whose conduct the FAA has not chosen to regulate. (Cf. *Jennings*, *supra*, 8 Cal.4th at pp. 135-136.) On matters of fundamental public policy, it is not the function of judges to

---

[6]This section, known as the "whistleblower" statute, provides in relevant part: "No employer shall retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or violation or noncompliance with a state or federal regulation." (§ 1102.5, subd. (b).)

substitute their own predilections in place of measured legislative (or quasi-legislative) judgment. I find it both ironic and disturbing that the majority caution lower courts against judicial policymaking while they themselves contribute to it.

The majority rely on several out-of-state cases to support their decision to allow wrongful discharge claims involving airline safety. But in those cases, there was no dispute that the particular employers and/or employees were subject to regulation by the FAA or that direct violations of FAA safety regulations were involved. (E.g., *Anderson* v. *Evergreen Intern. Airlines, Inc.* (1994) 131 Or.App. 726 [886 P.2d 1068, 1069, 1072-1073] [on review, court had to accept as true the plaintiff's allegations that the defendant airline company's operations were subject to regulation by the FAA and that the defendant ordered the plaintiff to act in violation of FAA regulations]; *Norris* v. *Hawaiian Airlines, Inc.* (1992) 74 Hawaii 235 [842 P.2d 634] [plaintiff was an FAA-licensed aircraft mechanic whose license did not permit him to authorize return of aircraft to service in violation of FAA regulations]; *Air Lines Pilots Association, International* v. *Quesada* (2d Cir. 1960) 276 F.2d 892 [suit by FAA-licensed airline pilots to enjoin FAA regulation forbidding commercial air carriers from utilizing pilots over age 60].[7] ) This court, then, appears to be the only one willing to allow employer liability in a situation where there is no showing of FAA oversight over the employer or employee and hence no evidence of a possible regulatory violation. (Cf. *Adolphsen* v. *Hallmark Cards, Inc.* (Mo.Ct.App. 1995) 907 S.W.2d 333 [plaintiff must specify the precise legal provision violated by the employer and the legal provision must involve a clear mandate of public policy].)

In closing, let me be clear. Like the majority, I strongly support motherhood, the American flag and commercial air safety. I also strongly agree with Congress's recognition that air safety is of vital public importance. But that is not enough to justify the result here. As the majority implicitly conclude, the congressionally expressed policy to promote air safety, standing alone, is too generalized a mandate to make any enforcement of the policy practicable through employment-related litigation. Having reached that conclusion, the majority should put an end to the instant litigation in strict accordance with *Gantt*'s limits on the permissible sources of public policies for *Tameny* claims. Although the majority claim to see a "clearly mandated public policy" in a regulation that has no applicability to defendant, what I see is a clear case of judicial policymaking.

---

[7]*Air Lines Pilots Association, International* v. *Quesada, supra*, 276 F.2d 892, is inapposite for the additional reason that the appellate court simply addressed the validity of the particular FAA regulation and did not discuss whether the alleged facts could properly support a state wrongful termination suit.

By turning their backs on established precedent, the majority have opened the door to virtually limitless litigation in California over what was once a narrowly contoured exception to the legislatively declared general rule of at-will employment. One cannot deny there are thousands and thousands of administrative regulations that have been promulgated pursuant to state and federal statutes. That reality, coupled with the majority's utter failure to provide any meaningful standards for determining when a regulatory provision sufficiently expresses a fundamental public policy with respect to a particular employer, makes it inevitable that the once-limited exception will become the general rule and effectively nullify the concept of at-will employment.

Since the majority's lack of discipline undoes years of decisional law, I join Justice Brown in her call for this court to take a fresh look at the public policy exception and its underlying rationale.

Brown, J., concurred.

**BROWN, J.**—I dissent.

### I

"Because air safety ranks somewhere in pecking order between motherhood and the American flag, it would be easy to concur fully in the majority opinion." (*F.A.A.* v. *Landy* (2d Cir. 1983) 705 F.2d 624, 637 (conc. and dis. opn. of Van Graafeiland, J.).) This case, however, is not about whether air safety is a matter of fundamental public policy. Rather, it concerns maintaining rational contours for the judicially created exception to the statutory principle of at-will employment. (Lab. Code, § 2922; see generally, *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] (*Tameny*).)

With legerdemain Harry Houdini would envy, the majority summarily dispatches recent efforts by this court to contain the "potent remedy" of tortious wrongful termination actions within workable confines. (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1090 [4 Cal.Rptr.2d 874, 824 P.2d 680] (*Gantt*).) Without principled explanation or justification, it dispenses with a series of limitations imposed in *Gantt, supra, Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238 [32 Cal.Rptr.2d 223, 876 P.2d 1022] (*Turner*), and *Jennings* v. *Marralle* (1994) 8 Cal.4th 121 [32 Cal.Rptr.2d 275, 876 P.2d 1074] (*Jennings*), and grants courts the unfettered discretion to "mistake their own predilections for public policy which deserves recognition at law." (*Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290, 297 [188

Cal.Rptr. 159, 35 A.L.R.4th 1015].) Under the majority holding, only regulations "that implement an important statutory objective" and "promote a 'clearly mandated public policy' " will qualify as *Tameny* predicates; and the majority is "confident" the courts will be able to distinguish those that do from those that do not. (Maj. opn., *ante*, at p. 90.) Yet, the sole criterion for identifying "an important statutory objective" is whether "the statute in question was designed to protect the public or advance some substantial public policy goal." (*Ibid.*) One is hard-pressed to formulate a more tautological standard, one which inevitably leaves the courts with ultimate control over both articulation and implementation of public policy. Not only does this result undermine the traditional "due deference to the judgment of the legislative branch" in such matters (*Gantt, supra,* 1 Cal.4th at p. 1095), it conflicts with the notice rationale undergirding *Gantt, supra,* 1 Cal.4th at page 1095, *Turner, supra,* 7 Cal.4th at page 1257, and especially *Jennings, supra,* 8 Cal.4th at pages 135-136.

In his dissent, Justice Baxter has cogently detailed many of the critical flaws and failings of the majority opinion. His analysis is compelling, and I fully endorse it. Because his criticisms and observations highlight the increasing disarray in our *Tameny* jurisprudence, I write further to discuss some of the reasons for our current muddle and to suggest a possible approach to a solution.

## II

For the last decade, since *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*), this court has struggled to formulate workable limitations on the cause of action for tortious wrongful termination or retaliatory discharge, now eponymically dubbed a *Tameny* claim. Upon careful analysis, it appears the taproot of our discontent is the *Tameny* decision itself.

In *Tameny, supra,* 27 Cal.3d 167, the plaintiff, alleging both contract and tort causes of action, brought suit after being terminated for refusing "to yield to his employer's pressure" to engage in acts constituting state and federal antitrust violations. (*Id.* at pp. 170-171.) The trial court sustained a demurrer to the tort claims. This court reversed on the basis that "an employer's obligation to refrain from discharging an employee who refuses to commit a criminal act does not depend upon any express or implied ' "promise[s] set forth in the [employment] contract" ' [citation], but rather reflects a duty imposed by law upon all employers in order to implement the fundamental public policies embodied in the state's penal statutes." (*Id.* at p. 176.)

In reaching this conclusion, the court uncritically adopted the holding of *Petermann* v. *International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184 [344 P.2d 25] (*Petermann*) and failed to respond to significant objections raised in both the concurrence and the dissent. (*Tameny, supra,* 27 Cal.3d at pp. 172-174.) Although Justice Manuel agreed the plaintiff could proceed on his tort claim, he counseled a more measured rationale than "the vague and ill-defined dictates of 'fundamental public policy,'" noting that "the cause of action here in question flows from a clear statutory source— i.e., the provisions of section 2856 of the Labor Code."[1] (27 Cal.3d at p. 179 (conc. opn. of Manuel, J.).) The *Tameny* majority cited the statute as "additional support for the *Petermann* ruling" (*id.* at p. 174, fn. 8), but failed to explain why this was not sufficient to vindicate the plaintiff's interests without the amorphous reference to public policy.

The majority also failed to rationalize allowing a wrongful termination cause of action in derogation of the statutory principle of at-will employment set forth in Labor Code section 2922.[2] (See *Tameny, supra,* 27 Cal.3d at p. 180 (dis. opn. of Clark, J.).) Nor did it respond to Justice Clark's criticism that "[t]oday's court judgment is a legislative judgment better left to the Legislature where, properly, public policy is declared. The Legislature has spoken [by enacting express exceptions to the at-will employment rule, e.g., former Elections Code section 1655 and Labor Code section 923]; if the system is to work, the Legislature will redeclare its position." (*Id.* at pp. 182-183; cf. *Gantt, supra,* 1 Cal.4th at p. 1095.)

Three years later, the New York Court of Appeals cited similar reasons for declining to adopt a public policy exception to at-will employment: "Those jurisdictions that have modified the traditional at-will rule appear to have been motivated by conclusions that the freedom of contract underpinnings of the rule have become outdated, that individual employees in the modern work force do not have the bargaining power to negotiate security for the jobs on which they have grown to rely, and that the rule yields harsh results for those employees who do not enjoy the benefits of express contractual limitations on the power of dismissal. Whether these conclusions are supportable or whether for other compelling reasons employers should, as a matter of policy, be held liable to at-will employees discharged in circumstances for which no liability has existed at common law, are issues better left to resolution at the hands of the Legislature. In addition to the fundamental question whether such liability should be recognized in New York, of

---

[1] Labor Code section 2856 provides: "An employee shall substantially comply with all the directions of his employer concerning the service on which he is engaged, except where such obedience is impossible or unlawful, or would impose new and unreasonable burdens upon the employee."

[2] Labor Code section 2922 provides in part: "An employment, having no specified term, may be terminated at the will of either party on notice to the other."

no less practical importance is the definition of its configuration if it is to be recognized.

"Both of these aspects of the issue, involving perception and declaration of relevant public policy (the underlying determinative consideration with respect to tort liability in general [citations]) are best and more appropriately explored and resolved by the legislative branch of our government. The Legislature has infinitely greater resources and procedural means to discern the public will, to examine the variety of pertinent considerations, to elicit the views of the various segments of the community that would be directly affected and in any event critically interested, and to investigate and anticipate the impact of imposition of such liability. Standards should doubtless be established applicable to the multifarious types of employment and the various circumstances of discharge. If the rule of nonliability for termination of at-will employment is to be tempered, it should be accomplished through a principled statutory scheme, adopted after opportunity for public ventilation, rather than in consequence of judicial resolution of the partisan arguments of individual adversarial litigants." (*Murphy* v. *American Home Products Corp.* (1983) 58 N.Y.2d 293, 301-302 [461 N.Y.S.2d 232, 235-236, 448 N.E.2d 86]; see also *Martin* v. *Tapley* (Ala. 1978) 360 So.2d 708; *DeMarco* v. *Publix Super Markets, Inc.* (Fla.Dist.Ct.App. 1978) 360 So.2d 134, affd. (Fla. 1978) 384 So.2d 1253; *Jones* v. *Local 926 of Intern. U. of Oper. Eng.* (1981) 159 Ga.App. 693 [285 S.E.2d 30], revd. on other grounds (1983) 460 U.S. 669 [103 S.Ct. 1453, 75 L.Ed.2d 368]; *Kelly* v. *Mississippi Valley Gas Co.* (Miss. 1981) 397 So.2d 874 [32 A.L.R.4th 1214].)

This analysis reflects an understanding that the Legislature is at least as able as the courts to recognize "the arbitrariness of an absolute right to discharge in light of contemporary employment relationships and the incompatibility of such a right to the attainment of a broad range of statutory objectives" (*Tameny, supra,* 27 Cal.3d at p. 172, fn. 7), but better able to respond to the perceived need in an orderly fashion. For example, the New York Court of Appeals noted that—as in California at the time *Tameny* was decided—the Legislature had already "afforded express statutory protection from firing for engaging in certain protected activities [citations]." (*Murphy* v. *American Home Products Corp., supra,* 461 N.Y.S.2d at p. 236, fn. 1 [448 N.E.2d at p. 90]; cf. former Elec. Code, § 1655, now Elec. Code, § 12312; Lab. Code, §§ 132a, 923; see also Gov. Code, § 12900 et seq.; Lab. Code, § 1102.5.) The court's observations further reflect an appreciation of the need at the outset to delineate the "configuration" of a public policy exception and to formulate well-defined standards for its application.

As discussed below, the crucial flaw in *Tameny* was in failing to articulate a rationale for creating an exception to the at-will employment rule. Because

the *Tameny* court justified its adoption of a tortious wrongful termination cause of action only in the most abstract conceptual terms, subsequent cases have had to proceed on a tortuous, ad hoc, and sometimes internally inconsistent basis in attempting to define its parameters, responding in the main to "the partisan arguments of individual adversarial litigants." (*Murphy* v. *American Home Products Corp.*, *supra*, 461 N.Y.S.2d at p. 236 [448 N.E.2d at p. 90]; compare *General Dynamics Corp.* v. *Superior Court* (1994) 7 Cal.4th 1164, 1180 [32 Cal.Rptr.2d 1, 876 P.2d 487] ["positive law," apparently including rules of professional conduct, may be source of public policy] with *Gantt*, *supra*, 1 Cal.4th at p. 1095 [claim must be tethered to "statutes and constitutional provisions"]; see also *Jennings*, *supra*, 8 Cal.4th 121 [no cause of action if employer not covered by statute]; *Turner*, *supra*, 7 Cal.4th 1238 [plaintiff must identify specific statutory provision articulating public policy]; *Foley*, *supra*, 47 Cal.3d 654 [statutory predicate must inure to public's benefit].) Yet in each instance, the exercise has yielded no clearer, more workable result; the court simply creates a patchwork unguided by any principled first cause. Today's decision perfectly illustrates the confusion produced by this inherent failing in *Tameny*.[3]

### III

To fault the analysis in *Tameny* is not to say the court reached the wrong result, only that, as Justice Manuel suggested, it should have done so by more modest means. A restrained approach would have been more consistent with the accretive nature of the common law and would have provided a clearer, more enduring rationale upon which to predicate future applications.

This court was not without precedent for developing common law principles in similar circumstances. In *Li* v. *Yellow Cab* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] (*Li*), we adopted the

---

[3] A recent Court of Appeal decision in which this court denied a depublication request actually provides an even more apt illustration: In *Phillips* v. *Gemini Moving Specialists* (1998) 63 Cal.App.4th 563 [74 Cal.Rptr.2d 29], the plaintiff, a "casual employee" of the defendant moving company, had admittedly caused damage to his employer's property. The employer deducted the amount of the damage—$35—from the employee's next paycheck, but without the latter's authorization. Thereafter, the employer refused to give the employee any more work. The employee sued for tortious wrongful termination based on the "public policy" set forth in Code of Civil Procedure section 487.020, which prohibits the attachment of an employee's earnings. The trial court sustained a demurrer, but the Court of Appeal reversed. After quoting extensively from *Gantt*, *Foley*, and *Turner*, the court concluded "that 'the prompt payment of wages due an employee is a fundamental public policy of this state' " and therefore Code of Civil Procedure section 487.020 qualified as a *Tameny* predicate. (*Phillips* v. *Gemini Moving Specialists*, *supra*, 63 Cal.App.4th at p. 571.) At least on the facts presented, one could hardly imagine a policy that *less* "involve[s] a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer . . . ." (*Gantt*, *supra*, 1 Cal.4th at p. 1090.)

rule of comparative negligence notwithstanding the provision of Civil Code section 1714 codifying the common law rule of contributory negligence. In doing so, the court in *Li*, unlike in *Tameny*, undertook a "thorough reexamination of the matter, giving particular attention to the common law and statutory sources of the subject doctrine in this state" to determine both the authority for and propriety of judicial modification. (13 Cal.3d at p. 810.)

Analyzing the legislative perspective and purpose of the 1872 Civil Code, the court explained "it was not the intention of the Legislature in enacting section 1714 of the Civil Code, as well as other sections of that code declarative of the common law, to insulate the matters therein expressed from further judicial development; rather it was the intention of the Legislature to announce and formulate existing common law principles and definitions for purposes of orderly and concise presentation and with a distinct view toward continuing judicial evolution." (*Li, supra,* 13 Cal.3d at p. 814; see also Civ. Code, §§ 4, 5.)[4] The court had previously undertaken incremental changes in tort law (e.g., *Summers v. Tice* (1948) 33 Cal.2d 80, 84-87 [199 P.2d 1, 5 A.L.R.2d 91]; *Ybarra v. Spangard* (1944) 25 Cal.2d 486, 489-492 [154 P.2d 687, 162 A.L.R. 1258]) and found no reason to believe "that the general language of section 1714 dealing with defensive considerations should be construed so as to stifle the orderly evolution of such considerations in light of emerging techniques and concepts [regarding comparative negligence]." (*Li, supra,* 13 Cal.3d at p. 822.) It thus concluded "section 1714 of the Civil Code was not intended to and does not preclude present judicial action in furtherance of the purposes underlying it." (*Id.* at p. 823.)

Finding authority to act did not end the inquiry; the court also examined a variety of "considerations of a practical nature" implicated in the proposed change. (*Li, supra,* 13 Cal.3d at p. 823.) After due consideration, it ultimately determined that none of the possible difficulties and uncertainties counseled against adopting comparative negligence. (*Id.* at pp. 823-829.) In sum, although the court acted in its common law capacity to modify substantially a legal doctrine, it did so consistent with the existing statutory framework and harmonized the change to ensure judicious development of relevant principles. As a result, subsequent application has maintained a consistency guided by definitive standards. (See, e.g., *Jess v. Herrmann*

---

[4]Civil Code section 4 provides: "The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this Code. The Code establishes the law of this State respecting the subjects to which it relates, and its provisions are to be liberally construed with a view to effect its objects and to promote justice."

Civil Code section 5 provides: "The provisions of this Code, so far as they are substantially the same as existing statutes or the common law, must be construed as continuations thereof, and not as new enactments."

(1979) 26 Cal.3d 131 [161 Cal.Rptr. 87, 604 P.2d 208]; *Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 829 [150 Cal.Rptr. 888, 587 P.2d 684]; *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899].)

No such orderly evolution has attended the development of our *Tameny* jurisprudence because the genesis was fatally flawed. In fact, it would be difficult to conceive a less auspicious beginning for a cause of action patently treading on legislative prerogatives. In the critical first instance, the court undertook no thorough reexamination of the matter, failed to explain how its holding was in furtherance of the purposes underlying the statutory framework of employment relations, and gave no apparent thought to considerations of a practical nature. (*Li, supra,* 13 Cal.3d at pp. 820, 823.) Instead, it arrogated to the courts the role of vindicating fundamental public policy, which it made the sole determinant of this potent remedy but left entirely undefined in context.

As Justice Baxter's dissent well documents, today's decision marks the culmination of the chaos wrought by the court's failure to adopt a disciplined and principled approach as in *Li.* To begin, the *Tameny* court failed to recognize that it was operating within an existing statutory scheme. The plaintiff's employment was admittedly at will under Labor Code section 2922 (see *ante,* at p. 99, fn. 2), yet the court engaged in only conclusory analysis in justifying its disregard of that fact. (*Tameny, supra,* 27 Cal.3d at pp. 173-174.) Nor did the court attempt to explain the need to resort to "fundamental public policy" to validate the plaintiff's tort claim. Labor Code section 2856 (see *ante,* at p. 99, fn. 1) would certainly have sufficed since the complaint alleged "that 'the sole reason' for [his] discharge was his refusal to commit the 'grossly illegal and unlawful acts which defendants tried to force him to perform.'" (*Tameny, supra,* 27 Cal.3d at p. 171, fn. omitted; see *id.* at p. 179 (conc. opn. of Manuel, J.).)

Instead of a more circumspect approach, we effectively conferred on the courts the role of declaring public policy, a function first and foremost reserved to the Legislature. (See *Gantt, supra,* 1 Cal.4th at p. 1095; *Slaughter* v. *Friedman* (1982) 32 Cal.3d 149, 158 [185 Cal.Rptr. 244, 649 P.2d 886]; *The Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437, 449-450 [94 P.2d 794]; *S. & V. R. R. Co.* v. *City of Stockton* (1871) 41 Cal. 147, 168; *City of South San Francisco* v. *Cypress Lawn Cemetery Assn.* (1992) 11 Cal.App.4th 916, 923 [14 Cal.Rptr.2d 323]; *McCarthy* v. *City of Oakland* (1943) 60 Cal.App.2d 546, 549-550 [141 P.2d 4]; *Thorne* v. *Macken* (1943) 58 Cal.App.2d 76, 81 [136 P.2d 116]; cf. *California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1, 24 [283 Cal.Rptr. 569, 812

P.2d 916].) Implicitly acknowledging the resultant tension, we attempted in *Gantt* to rectify the imbalance by requiring that "[a] public policy exception [be] carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions[, which] strikes the proper balance among the interests of employers, employees and the public." (*Gantt, supra*, 1 Cal.4th at p. 1095; see *United States* v. *Trans-Missouri Freight Ass'n.* (1897) 166 U.S. 290, 340-341 [17 S.Ct. 540, 558-559, 41 L.Ed. 1007].) Nevertheless, not six years later, the majority here considers itself at liberty to reach out to nonlegislative sources to validate plaintiff's *Tameny* claim. Surely, something is rotten in the state of our jurisprudence to permit such ambivalence.

The problem lies not simply in the overreaching, but also in making the only guiding principle "fundamental public policy." (See, e.g., *Tameny, supra*, 27 Cal.3d at p. 179 (conc. opn. of Manuel, J.).) Perhaps the most colorful explanation of the difficulty with the concept came from this court more than a century ago: "It has been well said that public policy is an unruly horse, astride of which you are carried into unknown and uncertain paths . . . ." (*Stephens* v. *Southern Pacific Co.* (1895) 109 Cal. 86, 89 [41 P. 783].) This point has apparently been self-evident to all but the *Tameny* court: "[I]t is generally agreed that 'public policy' as a concept is notoriously resistant to precise definition, and that courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, 'lest they mistake their own predilections for public policy which deserves recognition at law.' [Citation.]" (*Gantt, supra*, 1 Cal.4th at p. 1095; see *Safeway Stores* v. *Retail Clerks etc. Assn.* (1953) 41 Cal.2d 567, 575 [261 P.2d 721].) Even the Court of Appeal in *Petermann* forewarned, " ' "Public policy is a vague expression, and few cases can arise in which its application may not be disputed. Mr. Story in his work on Contracts (§ 546), says: 'It has never been defined by the courts, but has been left loose and free of definition . . . .' " ' " (*Petermann, supra*, 174 Cal.App.2d at p. 188.)

By its very nature, fundamental public policy "requires an exercise of judicial judgment that cannot be captured by the naked words of verbal formulae." (*Brecht* v. *Abrahamson* (1993) 507 U.S. 619, 656 [113 S.Ct. 1710, 1731, 123 L.Ed.2d 353] (dis. opn. of O'Connor, J.); cf. *In re Gallego* (1998) 18 Cal.4th 825 [77 Cal.Rptr.2d 132, 959 P.2d 290] (conc. and dis. opn. of Brown, J.).) Indeed, the majority in *Stevenson* candidly admitted as much: "This court has not articulated a test for determining when a public policy is sufficiently substantial and fundamental to support a cause of action for tortious wrongful discharge." (*Stevenson* v. *Superior Court* (1997) 16 Cal.4th 880, 895 [66 Cal.Rptr.2d 888, 941 P.2d 1157] (*Stevenson*); see also *City of Moorpark* v. *Superior Court* (1998) 18 Cal.4th 1143, 1160-1161

[77 Cal.Rptr.2d 445, 959 P.2d 752]; *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 90-91 [276 Cal.Rptr. 130, 801 P.2d 373].) Yet, every case following *Tameny* has simply repeated the "fundamental public policy" mantra, which remains, like any talisman, devoid of meaning or content. Little wonder its application yields no certain or reliable results across the spectrum of "multifarious types of employment and the various circumstances of discharge." (*Murphy* v. *American Home Products Corp.*, *supra*, 461 N.Y.S.2d at p. 236 [448 N.E.2d at p. 90]; cf. *People* v. *Birks* (1998) 19 Cal.4th 108, 138 [77 Cal.Rptr.2d 848, 960 P.2d 1073] (conc. opn. of Mosk, J.) ["In [*People* v. *Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]], we failed to articulate an implementing standard, a test for determining whether a lesser offense is 'related' to the charged offense. We implied that such a standard would articulate itself in the application. That was indeed our hope. It has not been fulfilled."].)

Until today, the court sensed the inherent tension and need to impose some of the discipline lacking in *Tameny*. *Gantt* attempted to reinstate the traditional balance between legislative and judicial roles in articulating public policy. (*Gantt*, *supra*, 1 Cal.4th at p. 1095.) In *Foley*, we limited claims to those implicating a policy "which inures to the benefit of the public at large rather than to a particular employer or employee." (*Foley*, *supra*, 47 Cal.3d at p. 669.) In *Turner* and *Jennings*, the court emphasized the importance of notice to employers that their conduct would contravene a particular public policy. (See *Jennings*, *supra*, 8 Cal.4th at pp. 132, 135; *Turner*, *supra*, 7 Cal.4th at p. 1257.) Ultimately, as the majority opinion bears witness all too well, these efforts fell short in bringing any meaningful definition to a cause of action for tortious wrongful termination.

The reason is one all too common to the judiciary: In each post-*Tameny* case, the court has engaged in decisionmaking by rote. We are content to rely on the "fundamental public policy" shorthand, confident we know one when we see it despite the admitted absence of any governing legal principles. (See maj. opn., *ante*, at p. 89; cf. *Jacobellis* v. *Ohio* (1964) 378 U.S. 184, 197 [84 S.Ct. 1676, 1683, 12 L.Ed.2d 793] (conc. opn. of Stewart, J.).) The problem with this process is that it masks the essential impropriety of the courts' assuming multiple roles: acting as legislators in deciding which fundamental policy will be implemented by their potent remedy, as prosecutors in choosing who may be accused of wrongdoing, and as judges in determining the ultimate scope of liability. Equally problematic is the ad hoc and ex post facto nature of these determinations. Is fundamental public policy really nothing more than what one trial court judge, or two appellate justices, or four members of this court say it is?

For all our avoidance, the task we face might prove deceptively simple. At their essence, tortious wrongful termination actions "are premised on closing

a gap that would otherwise leave public policy vulnerable to employers that could flout it with impunity through their hapless employees. [Citation.]" (*Stevenson, supra*, 16 Cal.4th at p. 921 (dis. opn. of Brown, J.); see *id.* at pp. 919-922.) In this respect, *Tameny* presented a classic paradigm: An employer demanded as a condition of employment that the employee commit a crime. Labor Code section 2856 protects employees from such overreaching. It does not, however, provide a specific remedy, and therein lies the legislative "gap" the court may properly fill in vindication of the public policy the statute implicitly reflects.

Adopting such an approach, the court would have fully articulated its rationale, and appropriate extension or limitation of its reasoning could proceed as an orderly evolution, not chaotic devolution. For example, the impetus in *Gantt* was to curtail the proliferation of *Tameny* claims. But, having to wrestle with "fundamental public policy" as the standard, it could only arbitrarily restrict them to causes of action predicated on statute or constitutional provision, some of which would still be unsuitable. (See *Foley, supra*, 47 Cal.3d at p. 669.) In this respect, the "gap" approach is objectively self-limiting: It would eliminate all cases in which the Legislature has provided some recourse, since the public policy incorporates the remedy. (See *Jennings, supra*, 8 Cal.4th at p. 130; see also *Stevenson, supra*, 16 Cal.4th at pp. 919-925 (dis. opn. of Brown, J.).) At the same time, application would not be inherently restricted to statutory policy sources; regulations might well come within this rationale.[5] Nevertheless, a nexus or necessary linkage must exist between the public policy and legislative intention to protect employees from wrongful termination in relation thereto.

## IV

Llewellyn exhorts judges "to take at least one fresh look" each time they confront a recurring issue. (Llewellyn, The Common Law Tradition (1960) p. 293.) "The new prodding of the new facts may bring something better into focus. The queer subconscious may this time be ready to give up an out which has been cooking down in there since the last time the court walked through these legal sandburs. In this effort to take a [fresh] look each time, the appellate court's job, their duty, [is] to freshen up consciously . . . . It *must not* be what all habit, all routine, all weariness cry out that it is and has to be: just another of the shopworn same." (*Id.* at pp. 293-294.)

---

[5]On these facts, however, I would not agree with the majority's determination that plaintiff has a viable cause of action. The Federal Aviation Act regulations alluded to do not apply to defendant. (See *Jennings, supra*, 8 Cal.4th at pp. 135-136.) Moreover, the Legislature has already determined plaintiff's conduct should be accorded wrongful termination protection only when suspected regulatory violations are "disclos[ed] . . . to a government or law enforcement agency . . . ." (Lab. Code, § 1102.5, subd. (b).) In my view, the statute articulates the extent of any relevant public policy. (Cf. *Jennings, supra*, 8 Cal.4th at p. 130.)

In hindsight, the better part of valor might have been to heed Justice Clark's admonition to leave creating exceptions to at-will employment with the Legislature. At the very least, we should heed the lessons of experience. In my view, the time has come for the court to take a fresh look at our *Tameny* jurisprudence or, in our own words, undertake a "thorough reexamination of the matter," starting with a principled articulation of the rationale for a public policy exception to the at-will employment statute. (*Li, supra,* 13 Cal.3d at p. 810.)

Baxter, J., concurred.

Respondent's petition for a rehearing was denied October 21, 1998. Baxter, J., and Brown, J., were of the opinion that the petition should be granted.