Filed 2/28/14  Brede v. Science Applications International Corp. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HERBERT C. BREDE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>SCIENCE APPLICATIONS INTERNATIONAL CORPORATION,<br><br>Defendant and Respondent. | D061764<br><br><br><br>(Super. Ct. No. 37-2008-00094414-CU-WT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Randa Trapp, Judge.  Affirmed.

Jacobs & Schlesinger, Johanna S. Schiavoni and David A. Schlesinger for Plaintiff and Appellant.

Paul, Plevin, Sullivan & Connaughton, Michael C. Sullivan, Sandra L. McDonough and Gregory J. Halsey for Defendant and Respondent.

Plaintiff Herbert C. Brede asserts he was wrongfully terminated from his employment as a contracts manager with Science Applications International Corporation

(SAIC) in retaliation for raising concerns with his employer regarding the propriety of representations made to a client during renegotiation of a contract. Brede claims that, after years of exemplary service, he received a layoff notice two weeks after discussing his concerns with a supervisor. SAIC moved for summary judgment contending Brede was laid off for legitimate business reasons and there is no basis for Brede's retaliation claims because he could not establish either a violation of Labor Code section 1102.5, subdivisions (a) or (d), or wrongful termination in violation of public policy. The trial court granted summary judgment.

On appeal, Brede asserts the court erred in granting summary judgment because triable issues of fact exist regarding whether the reason for termination was pretext for retaliation. Brede also asserts the court abused its discretion in denying oral motions to continue the hearing to complete a deposition and for leave to amend the complaint. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Background Regarding SAIC Business Units*

SAIC is a private scientific, engineering and technology applications company. It is organized into various business units that contract with governmental and commercial entities.

The Commercial Business Services Business Unit (CBS Business Unit) provides technical and professional services to private companies along with local and state governments under commercial contracts. In this commercial environment, contract discussions are held between the customer and a number of SAIC representatives

2

including senior managers, program managers and members of the sales team. The contracts manager assigned to the account sometimes plays a background role in negotiations. The contracting environment in this unit is generally flexible and professionals are given wide latitude to bargain competitively. The CBS Business Unit operates under an accounting structure referred to as "Company 21." The Company 21 structure is subject to generally accepted accounting principles.

In contrast to the CBS Business Unit, business units dealing with federal government contracts are more prescribed. They are bound by federal cost principles established by the Federal Acquisition Regulation and they are subject to cost accounting standards. In these units, the SAIC contracts manager is typically the single point of contact with the government contracting officer and the negotiation parameters are more narrow than they are for contracts in the CBS Business Unit. SAIC uses an accounting structure referred to as "Company 6" for federal government contracts. Because Company 6 contracts have prescribed rules for what items can be billed as direct charges, indirect rates or overhead costs tend to be higher than those for commercial contracts negotiated under the Company 21 structure. Additionally, employees classified to work on Company 21 contracts are not permitted to work on projects performed under the Company 6 structure.

B. *Brede's Employment with SAIC*

Brede was hired in 1996 as a senior contracts representative working in the Range and Information Systems Business Group (RS Business Group) where he handled

3

contracts with the federal government. He performed well in this setting and received company awards recognizing and rewarding his contributions.

Brede had strengths in federal contracting programs, an area in which he had worked for many years. However, when SAIC reorganized the RS Business Group, Brede chose to transfer to the CBS Business Unit in 2005. In this position, his new supervisors expressed concern that he demonstrated inflexibility in working with commercial contracts. Brede's evaluation in 2006 was poor with an overall performance rating of two out of five, indicating his performance only partially met SAIC's expectations. According to the review, Brede did not appear comfortable with the assignment to support the commercial contracts department and his inflexible approach resulted in damaged relationships with both internal and external clients.

Brede's March 2007 performance evaluation noted improvements and rated his overall performance as three out of five, which indicates he met SAIC expectations. But it also noted areas Brede still needed to address. His supervisor, Pellegrino, still found him rigid in his negotiation style, both internally and externally. Brede frequently raised questions and concerns from a federal contracting perspective that were not applicable to the commercial contract environment. Pellegrino did not perceive Brede as flexible in meeting special issues requested by commercial clients, such as lawful modifications to contract language. Brede was not accustomed to the contracting flexibility and authority that CBS managers had with negotiating commercial contracts or the heightened role played by the project managers/business development team and senior SAIC managers in the commercial environment.

4

C.  *Renegotiation of Chicago RTA Contract*

In late 2006 Steve Bullington, the SAIC program manager for the Chicago Regional Transportation Authority (Chicago RTA) commercial contract, suggested changing the Chicago RTA contract from a Company 6 structure to a Company 21 structure.  If the contract was not subject to the federal accounting requirements of a Company 6 structure, SAIC could offer lower established rates.  Additionally, this was one of the last Company 6 contracts in the unit.  Since most of the staff in the CBS Business Unit resided under Company 21, it was difficult to find adequate staff to support the contract.  By changing to a Company 21 structure, SAIC could provide better service at a lower overall cost.

When Bullington discussed this idea with Brede, Brede raised a business concern.  Brede said that modifying the billing structure might not benefit SAIC because the indirect rate would be lower under Company 21 than it was under Company 6 since some of SAIC's administrative and financial functions included in Company 6 indirect rates are billed as direct rates under the Company 21 structure.  He also stated that Chicago RTA should be informed about the differences between the two billing structures.

Pellegrino negotiated the modification of the Chicago RTA contract from a Company 6 structure to a Company 21 structure.  Chicago RTA was aware of prior indirect labor burden rates under the Company 21 structure and accepted the new proposed rate of 95 percent as more beneficial than the 117 percent rate it previously had under the Company 6 structure.

Brede was not personally involved in the renegotiation and had no knowledge of the proposal submitted to Chicago RTA or of any discussions with them that resulted in a change to the billing rate structure. Brede signed a task order on April 5, 2007, reflecting the revised rates. He did not express any concerns regarding the revised contract.

According to Brede, Bullington came into his office in early April 2007 and stated, "That was kind of a dicey situation with the Chicago RTA." Brede says he answered Bullington by saying, "If the customer agrees to change the billing rates, they agree to change the billing rates. Nothing wrong with that." To which Brede claims Bullington responded, "Yeah, but I'm pretty sure you can't lie to them about what those rates are."

Brede did not ask what Bullington meant by this statement and purposefully did not react because he wanted to talk to Pellegrino. Bullington also mentioned that Pellegrino asked if Bullington wanted Brede removed from the Chicago RTA contract.

D. *Brede's Discussion with Pellegrino*

In mid-April, when Pellegrino returned from a trip out of the country, Brede told Pellegrino that Bullington thought something improper had occurred during the negotiation of the contract modification. Brede also said Bullington told him that Pellegrino asked if Bullington wanted Brede removed from the contract. According to

6

Brede, Pellegrino became defensive and did not say anything in response to Brede's statements.[1]

E. *SAIC's Reorganization and Layoff Decision.*

In February 2007, before Pellegrino renegotiated the Chicago RTA contract, SAIC determined that it needed to cut costs in the business unit due to the loss of certain contracts and business pressures on profitability. Michael Payne, director of contracts for the business unit, also decided to reorganize the department and to move the client relationship with Pfizer closer to the East Coast where most of the Pfizer contacts were located. This move enabled SAIC to "fully load a single staff member as opposed to having two staff members that were underutilized."

Payne told Pellegrino, the western contracts manager of the CBS Business Unit, that they needed to lay off one of the four contracts managers in that department and asked for Pellegrino's recommendation. Payne and Pellegrino looked at the pool of

---

[1] Brede asserts that he heard about other ethical concerns from other SAIC employees and that he attempted to relay these concerns to Pellegrino. We do not consider these other concerns in our analysis of the summary judgment ruling because the trial court sustained SAIC's objections to Brede's declaration regarding these other issues. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [the court does not consider evidence to which objections have been made and sustained].) Brede did not challenge the evidentiary rulings below or in his opening brief. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [the court is not required to consider issues that are not argued or supported by citation to the record or legal authority].) We disregard Brede's belated attempt to challenge the court's evidentiary rulings in a footnote to his reply brief. "'Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant. [Citations.]' [Citation.] '"The rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before."'" (*In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1477.)

7

contracts serviced by the CBS Business Unit, the skill set of each of the managers and their performance in servicing their respective assignments.  Each of the contracts managers in the CBS Business Unit—other than Brede—received performance reviews rating their performance as exceeding expectations (four out of five).  One possessed specialized experience in state and local government contracts and had vital relationships with local entities.  Another had specialized expertise in export and international business sectors.

Brede's primary task in 2007 was the Pfizer account.  SAIC determined that another contracts manager, who had worked with Pfizer in the past, was more suitable to handle that client because he had demonstrated a better ability to be flexible in meeting the customers and because he worked better with internal staff.  This other manager also worked in Chicago, which made it easier to work with the East Coast client.

Although Brede was skilled in certain technical contracting areas, Payne and Pellegrino considered Brede to be the lowest performer of the four contract managers in meeting the needs and objectives for the CBS business unit.  As a result, SAIC decided to lay off Brede.

In May 2007, approximately two weeks after Brede discussed the Chicago RTA contract modification with Pellegrino, Brede received notice of layoff.

F.  *Brede's Ethics Complaint*

After receiving notice he was being laid off, Brede complained to SAIC's general counsel that he was terminated after raising "ethical concerns with my supervisor" regarding the Chicago RTA contract modification.  Brede claimed, "[T]he customer was

8

intentionally misinformed of SAIC's Company 21 rate structure in order to inflate the cost basis and achieve significantly more than the 10% fixed fee stated in the agreement." SAIC's ethics committee found no merit to Brede's concerns. Specifically, they found there was no intent to mislead the customer. However, they recommended discussions with the customer to further modify the contract language to accurately reflect the new payment terms.

G. *Brede Files Suit*

Brede filed suit against SAIC alleging his termination "resulted from his discovery and revelation of misrepresentations regarding SAIC's rate structure and billing practices applicable to a contract it had with [Chicago RTA] and SAIC's practice of overcharging as a result." He alleged that this conduct, "which potentially gave rise to both criminal and civil liability," was brought to Brede's attention by another employee. Brede alleged he was laid off two weeks after he brought his concerns to the attention of his supervisor. Brede asserted a cause of action for retaliation against whistle blowing in violation of former Labor Code section 1102.5, subdivisions (a) and (d), and a cause of action for wrongful termination in violation of public policy.[2]

---

[2] At that time, former Labor Code section 1102.5 provided in part: "(a) An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation. [¶] (b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

9

H. *SAIC's Motion for Summary Judgment*

SAIC moved for summary judgment on the grounds that Brede cannot prevail on his wrongful termination claims. SAIC argued Brede cannot establish his first cause of action for violation of Labor Code section 1102 under either subdivision (a) or subdivision (d). SAIC presented evidence that it does not have a policy preventing disclosure of illegal conduct to a government or law enforcement agency, but rather that its policies require employees to disclose reasonable suspicions of unethical illegal conduct. SAIC also argued that Brede cannot establish a claim for violation of Labor Code section 1102, subdivision (d) because there is no allegation that SAIC retaliated against Brede for exercising his rights to disclose information in any former employment.

SAIC argued Brede cannot establish his second cause of action for wrongful termination in violation of public policy because (1) Brede cannot show he made a protected disclosure supported by fundamental public policy, (2) the reported concern did not involve a matter of public policy as opposed to a private business concern, and (3) Brede cannot establish a causal link between his alleged report and his layoff because Brede was terminated for a legitimate business reason. SAIC presented evidence regarding SAIC's business decision to reorganize the contracts department and to lay off

[¶] (c) An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation. [¶] (d) An employer may not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment." Brede did not allege violations of subdivisions (b) or (c). The statute was amended in 2013 (Stats. 2013, ch. 781, § 4.1, eff. Jan. 1, 2014), but the amendments do not change our analysis. All further references are to the former section.

10

a contracts manager, as well as evidence regarding how Pellegrino and Payne arrived at the decision to lay off Brede.

I. *Brede's Opposition to Summary Judgment Motion*

Brede opposed the motion for summary judgment arguing that he can establish a prima facie case because SAIC terminated his employment two weeks after he reported potential fraudulent billing to his supervisor. While not pled in his complaint, Brede argued these acts would constitute violations of the federal False Claims Act (31 U.S.C. § 3729 et seq.) and the California False Claims Act (Gov. Code, § 12650 et seq.). He argued he can maintain a claim under Labor Code section 1102.5, subdivisions (a) and (c) because he was terminated for reporting potential violations of state or federal law. He asserted SAIC's claim that he was terminated for a legitimate business reason is pretext because he is a well-educated, experienced SAIC contracts manager. He presented two letters he received for SAIC awards in 1997 and 2004 for his contributions to the company. He also presented his performance review from March 2007 and cited the form language defining a three out of five rating to argue that his performance was positive.[3] Brede argued this evidence is not consistent with SAIC's claim that he was terminated for performance reasons.

---

[3]    The performance rating form defines a three out of five performance as follows: "**3 Consistently Meets Expectations; Highly Successful Performance** Performance consistently meets SAIC expectations for the position. Employee is fully capable; performance is solid, well-balanced, dependable and competent."
    A four out of five performance is defined as follows: "**4 Frequently Exceeds Expectations; Exemplary Performance** Performance exceeds SAIC expectations in

11

Brede argued he should prevail on his cause of action for wrongful termination in violation of public policy because he reasonably suspected that SAIC had violated the federal False Claims Act by fraudulent billing of Chicago RTA and because he was laid off two weeks after reporting these suspicions to his employer.

J. *Trial Court Grants Summary Judgment*

The trial court granted SAIC's motion for summary judgment finding no basis for either the first cause of action for retaliation against whistleblowing in violation of Labor Code section 1102.5 or the second cause of action for wrongful termination in violation of public policy. Brede admitted that SAIC did not make, adopt or enforce any rule, regulation or policy preventing an employee from disclosing information in violation of Labor Code section 1102.5, subdivision (a). Additionally, Labor Code section 1102.5, subdivision (d) does not apply because Brede admitted that SAIC did not retaliate against him for exercising his rights in any *former* employment.

Even though the court found no legal basis for a claim under Labor Code section 1102.5, the court continued its analysis by assuming without deciding that Brede established a prima facie case. Nevertheless, the court found that SAIC had shown, based on the declarations of Pellegrino and Payne, a nonretaliatory explanation for its acts and that Brede did not provide specific and substantial evidence to create a triable issue that his termination was a pretext for retaliation. The court noted in its ruling "it

several important areas of the position. Employee performs the most difficult and complex aspects of the position, including additional responsibilities as assigned."

Specific comments regarding employee performance appear to be reflected in other evaluation boxes within the form.

12

appears the decision [to] terminate him occurred around February 2007, before he expressed his concerns to his employer in April 2007. . . . Brede received [employee achievement] awards in 1997 and 2004; the last being three years before his lay-off [*sic*]. . . . His last performance evaluation before his layoff rated his performance as only meeting, as opposed to exceeding, expectations. . . . In any event, the decision makers looked at [the] overall and current performance when making their decision, as well as business needs, leaving only the timing of the decision as relevant. However, temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination."

The court also found no basis for a claim of wrongful termination in violation of public policy based on Brede's allegations that he reasonably believed his employer had violated state and federal law, including Labor Code section 1102.5. The court did not consider Brede's new claims that SAIC had violated the federal or Californa False Claims Acts because they were not pled in his complaint. Again, the court ruled that Brede did not provide substantial responsive evidence to SAIC's showing of a legitimate, nonretaliatory explanation for its acts.

At the hearing, after reviewing the court's tentative opinion, Brede asked for a continuance of the hearing to complete the deposition of Pellegrino and asked for leave to amend the complaint to add allegations that SAIC violated the federal and California false claims acts as well as a reference to Labor Code section 1102.5, subdivision (c). The court confirmed the tentative.

13

DISCUSSION

## I. *Standards Governing Motions for Summary Judgment*

A defendant is entitled to summary judgment if it establishes a complete defense to the plaintiff's cause of action or shows that one or more elements of the cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)

Because a motion for summary judgment raises only questions of law, we independently review the parties' supporting and opposing papers and apply the same standard as the trial court to determine whether there exists a triable issue of material fact. (*City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575, 582; *Southern Cal. Rapid Transit Dist. v. Superior Court* (1994) 30 Cal.App.4th 713, 723.) First, we analyze the pleadings. Since the pleadings delimit the issues to be considered on a motion for summary judgment, a defendant need only address the allegations raised in the complaint. (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064; *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253.) Second, we determine if the defendant met its burden of showing that the cause of action has no merit either because one or more elements of the cause of action cannot be established or because there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) Third, if the defendant has met its burden, the burden shifts to the plaintiff to show a triable, material controversy as to whatever element of the cause of action defendant claims is not established. (*Ibid.*)

We liberally construe the evidence in support of the party opposing summary judgment (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142) and assess whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment under the applicable legal standards.  (Cf. *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850.)

## II.  *The Trial Court Properly Granted Summary Judgment*

Brede claims on appeal that the court erred in granting summary judgment of his cause of action for wrongful termination in violation of public policy.[4]  We disagree.

A.  *Standards for Wrongful Termination in Violation of Public Policy Cause of Action*

Generally, an employee may be terminated at will for any reason, or no reason, so long as the reason is not unlawful or for a purpose that contravenes fundamental public policy.  (Lab. Code, § 2922; *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1094, overruled on another ground in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, fn. 6; *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172.)  The Supreme Court explained the foundations of the public policy-based wrongful discharge cause of action: "We have held that this public policy exception to the at-will employment rule must be

---

[4]     Brede does not challenge the summary adjudication of his first cause of action for retaliation against whistleblowing based upon Labor Code section 1102.5, subdivision (a) (precluding employer from making, adopting or enforcing a rule, regulation or policy preventing an employee from disclosing information he or she has reasonable cause to believe discloses a violation of law or a violation or noncompliance with a rule or regulation) or subdivision (d) (precluding retaliation against an employee for exercising whistleblowing rights in former employment).

based on policies 'carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions . . . .' [Citation.] This requirement 'grew from our belief that "'public policy' as a concept is notoriously resistant to precise definition, and that courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch" in order to avoid judicial policymaking.' [Citation.] It also serves the function of ensuring that employers are on notice concerning the public policies they are charged with violating. 'The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes . . . .' [Citations.] The public policy that is the basis of this exception must furthermore be '"public" in that it "affects society at large" rather than the individual, must have been articulated at the time of discharge, and must be "'fundamental'" and "'substantial.'"'" (*Silo v. CHW Medical Foundation* (2002) 27 Cal.4th 1097, 1104.)

"Tort claims for wrongful discharge typically arise when an employer retaliates against an employee for '(1) refusing to violate a statute . . . [,] (2) performing a statutory obligation . . . [,] (3) exercising a statutory right or privilege . . . [, or] (4) reporting an alleged violation of a statute of public importance.'" (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1256, overruled on another ground in *Romano v. Rockwell International* (1996) 14 Cal.4th 479, 498; see also *Green v. Ralee Engineering Co.*, *supra*, 19 Cal.4th at p. 76; *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889.) An employee may recover for wrongful discharge if he or she establishes he or she was "terminated in retaliation for reporting to his or her employer reasonably suspected illegal

16

conduct by other employees that harms the public as well as the employer." (*Collier v. Superior Court* (1991) 228 Cal.App.3d 1117, 1119-1120.)

In analyzing a claim for wrongful employment termination in violation of public policy, we bear in mind the burden-shifting analysis of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 to determining if triable issues of fact exist for resolution by a jury. First, the "'plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.'" (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108-1109.) In other words, a plaintiff must show a nexus between the protected activity and the adverse employment action. (*Turner v. Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at pp. 1258-1259.) Second, "[i]f the employee successfully establishes these elements and thereby shows a prima facie case exists, the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment action." (*Loggins v. Kaiser Permanente Internat., supra,* 151 Cal.App.4th at p. 1109.) Third, "[i]f the employer produces evidence showing a legitimate reason for the adverse employment action, 'the presumption of retaliation """drops out of the picture,"""' [citation], and the burden shifts back to the employee to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual [citation]." (*Ibid*.)

Applying this analysis to summary judgment proceedings, an employer is entitled to summary judgment if it "presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was

17

based on legitimate, [nonretaliatory] factors . . . unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing." (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203.)

Although the evidence must be viewed in the light most favorable to the plaintiff, the plaintiff's subjective beliefs "do not create a genuine issue of fact." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433.) Nor can a plaintiff avoid summary judgment by merely providing *some* evidence suggesting an improper motive for her termination. (*Ibid.*) Rather, the "plaintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." (*Id.* at pp. 433-434.) "[A] plaintiff's 'suspicions of improper motives . . . primarily based on conjecture and speculation' are not sufficient to raise a triable issue of fact to withstand summary judgment." (*Kerr v. Rose* (1990) 216 Cal.App.3d 1551, 1564.)

B. *Application*

In this case, Brede asserted that SAIC terminated him in retaliation for reporting unlawful conduct, which "violates Labor Code section 1102.5 and violates the public policy served by an employee's ability and right to report suspicions of illegal conduct to his or her employer." Brede alleged that he received the notice of layoff two weeks after he reported to his supervisor reasonable concerns that SAIC misrepresented or failed to fully inform Chicago RTA of the implications of changing contract terms from a Company 6 structure to a Company 21 structure, which he claims could potentially give rise to "both criminal and civil liability." Brede argued that this temporal proximity

along with a positive performance review two months before establishes his prima facie case.

SAIC's summary judgment motion argued that Brede cannot establish the essential elements of his prima facie case and that SAIC had a legitimate, nonretaliatory business reason to terminate Brede. SAIC presented evidence that it did not violate Labor Code section 1102.5, subdivision (a) because it had a policy *requiring* employees to disclose reasonable suspicions of illegal or unethical conduct and that Brede acknowledged this policy in writing. Brede did not dispute this evidence. SAIC also presented evidence that it could not have violated Labor Code section 1102.5, subdivision (d), because Brede's report concerned actions by SAIC, not a former employer, and he did not raise concerns regarding unlawful activity at a prior employer. Brede did not dispute this evidence.[5]

SAIC also presented evidence that there was no reasonable basis for Brede to believe the activity disclosed was illegal activity. SAIC established there was no intention to mislead the client. Chicago RTA was aware from prior task orders that Company 21 had a labor burden rate of 55.2 percent, and it accepted the proposed 95 percent rate because it was lower than the Company 6 labor burden rate of 117.4 percent.

---

[5] Brede argues that the trial court erred in declining to consider application of state and federal false claim statutes to support his claim for wrongful termination in violation of public policy. This argument has no merit. The trial court correctly declined to consider these statutes because they were not pled. On summary judgment, a defendant need only address the allegations raised in the complaint. (*Laabs v. City of Victorville, supra,* 163 Cal.App.4th at p. 1253.)

Brede admits he was not involved in the contract renegotiation process and did not see the new contract until after he was terminated.

In response to SAIC's evidence, Brede offered only his own testimony about his conversation with Bullington regarding the contract renegotiation. When Brede told Bullington there was nothing wrong with changing the billing rates if the client agreed, Bullington allegedly responded, "Yeah, but I'm pretty sure you can't lie to them about what those rates are." Brede did not ask Bullington what he meant by this statement.

Brede's subjective interpretation about what Bullington meant is not sufficient to raise a triable issue of fact. "'A party cannot avoid summary judgment based on mere speculation and conjecture [citation], but instead must produce admissible evidence raising a triable issue of fact.'" (*Pacific Gas & Electric Co. v. City of Oakland* (2002) 103 Cal.App.4th 364, 371; see also *Chiaramonte v. Fashion Bed Group* (7th Cir. 1997) 129 F.3d 391, 401 ["'If the subjective beliefs of plaintiffs in employment . . . cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.'"].)

While Brede's evidence that he received a notice of layoff two weeks after he reported his suspicions of improper conduct related to the Chicago RTA contract renegotiation may be sufficient to meet Brede's prima facie burden, he did not provide substantial responsive evidence showing that SAIC's proffered reasons for layoff were untrue or pretextual.

SAIC presented undisputed evidence showing that SAIC made a business decision to reorganize the CBS Business Unit to reduce costs, which included the need to lay off

20

one of the four contract managers. This decision was made in February 2007, *before* the Chicago RTA contract was renegotiated. Brede presented no evidence to dispute SAIC's showing that the other contracts managers received higher performance evaluations during the relevant time period or that they had skills and strengths more suited to the client needs. Brede's evidence that he performed well in years prior to joining the CBS Business Unit, where he handled different contracts, is not relevant to the business decision in 2007.

Brede argues the trial court erred in determining the decision to lay him off was made prior to his report because the layoff worksheet provided by SAIC is undated. While SAIC did not provide the notice of layoff until after Brede's discussion with Pellegrino, Brede cannot dispute that the wheels were in motion long before this discussion. In fact, Pellegrino asked Bullington about removing Brede as the contracts manager for Chicago RTA *before* Brede reported his concerns to Pellegrino.

Brede's only evidence to support his claim that SAIC's reason for termination was pretextual was temporal proximity, i.e., that he received his notice of layoff two weeks after raising the issue of misrepresentation with Pellegrino. This is insufficient.

We have held that evidence of temporal proximity alone is not sufficient to avoid summary judgment. "[T]emporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual. [A] contrary argument, if accepted, would eviscerate the

21

*McDonnell Douglas* [*v. Green, supra,* 411 U.S. 792] framework for resolving claims at the demurrer or summary judgment stage, because the same minimal showing required of the plaintiff to raise a prima facie case would also suffice to preclude the employer from obtaining summary judgment notwithstanding otherwise unrebutted proof of articulated legitimate reasons for the employment termination. Instead, an employee seeking to avoid summary judgment cannot simply rest on the prima facie showing, but must adduce substantial additional evidence from which a trier of fact could infer the articulated reasons for the adverse employment action were untrue or pretextual." (*Loggins v. Kaiser Permanente Internat., supra,* 151 Cal.App.4th at pp. 1112-1113.)

Because Brede did not meet his burden of responding to SAIC's evidence of its legitimate, nonretaliatory business reason for termination, the trial court properly granted summary judgment.

### III. *The Trial Court Properly Exercised Its Discretion To Deny Brede's Oral Request for Continuance*

Brede contends the trial court abused its discretion in denying his continuance request, which he maintains must be exercised liberally in favor of granting the continuance. We disagree.

Code of Civil Procedure section 437c, subdivision (h) provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment . . . that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just." It is not

22

sufficient that a declaration in support of such a continuance indicate further discovery or investigation is contemplated; it must show "'facts essential to justify opposition may exist.'" (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 548.) Thus, the plaintiff must show "that the . . . discovery requested could reasonably lead to evidence necessary to refute" the defendants' evidence. (*Scott v. CIBA Vision Corp.* (1995) 38 Cal.App.4th 307, 326.) If the plaintiff does not make the required showing by affidavit, a continuance is not mandatory. (*Bahl v. Bank of America* (2001) 89 Cal.App.4th 389, 393; *Scott v. CIBA Vision Corp.*, at pp. 313-314, 326.) In this case, a continuance was not mandatory because Brede did not submit an affidavit making the necessary showing "that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented." (Code Civ. Proc., § 437c, subd. (h).)

When a continuance is not mandatory because of the plaintiff's failure to meet the requirements of Code of Civil Procedure section 437c, subdivision (h), the court determines whether the party requesting a continuance has established good cause for such a request. (*Lerma v. County of Orange* (2004) 120 Cal.App.4th 709, 716.) We review the court's ruling on that question for abuse of discretion. (*Ibid.*)

We agree with the reasoning of the court in *Cooksey v. Alexakis* (2004) 123 Cal.App.4th 246, which concluded, in keeping with a majority of courts addressing the matter, that lack of diligence may be a ground for denying a request for a continuance of a summary judgment motion hearing: "Although [Code of Civil Procedure section 437c, subdivision (h)] does not expressly mention diligence, it does require a party seeking a continuance to declare why 'facts essential to justify opposition . . . cannot, *for reasons*

23

*stated*, *then* be presented' [citation, italics added by *Cooksey*], and courts have long required such declarations to be made in good faith. [Citations.] There must be a justifiable reason why the essential facts cannot be presented. An inappropriate delay in seeking to obtain the facts may not be a valid reason why the facts cannot then be presented. The statute itself authorizes the imposition of sanctions for declarations presented in bad faith or solely for purposes of delay. [Citation.] A good faith showing that further discovery is needed to oppose summary judgment requires some justification for why such discovery could not have been completed sooner." (*Cooksey*, at p. 257.)

The record shows that the hearing on the motion for summary judgment was continued several times at the request of the parties for a period of approximately six months. The court first continued the hearing at the request of SAIC, which explained that, after settlement discussions had broken down, the parties were engaged in discovery efforts. SAIC cited Brede's need to gather evidence to oppose the summary judgment motion, including the need for deposition testimony. After filing his opposition to the motion for summary judgment, Brede sought and obtained an additional 60-day continuance of the hearing on the basis that he had obtained a new lawyer and that he needed additional discovery to obtain documents and deposition testimony to oppose the motion. When Brede's second attorney moved to withdraw as counsel of record, SAIC applied again to continue trial and the summary judgment hearing to allow Brede time to file an updated opposition to the motion for summary judgment. The court continued the summary judgment hearing another 30 days.

Brede never did file additional opposition papers. In fact, at the hearing granting Brede's attorney's motion to be relieved as counsel, Brede requested a continuance of trial, but stated he did *not* want another continuance of the summary judgment hearing.

It was not until the hearing on the summary judgment motion, after Brede had a copy of the tentative ruling, that he orally requested a continuance to complete the deposition of Pellegrino and asserted that SAIC had obstructed the completion of his deposition. Brede was represented when at least one session of Pellegrino's deposition was scheduled. Neither he nor his counsel moved to compel Pellegrino's deposition.

In short, Brede did not make a proper showing of good cause to justify a continuance. On this record, the trial court's order was not an abuse of discretion.

IV. *The Trial Court Did Not Abuse Its Discretion in Denying Leave To Amend*

Brede also argues the court erred in declining to allow him leave to amend his complaint to add the federal and California false claims statutes and to add a specific reference to Labor Code section 1102.5, subdivision (c). However, Brede did not seek leave to amend before the hearing on summary judgment. "To create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings. [Citation.] If the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion." (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264-1265.) Additionally, Brede cannot show prejudicial error. Even if leave to amend had been granted to plead violations of the False Claims Act or Labor Code section 1102.5 subdivision (c), as discussed, *ante*, Brede failed to

25

meet his burden to establish that the nondiscriminatory reason given by SAIC for his termination was pretextual.

## DISPOSITION

The judgment is affirmed.  Costs on appeal to SAIC.


NARES, J.

WE CONCUR:


McCONNELL, P. J.


McDONALD, J.